## PENNSYLVANIA R. Co. *v.* WASHBURN *et al.*

*(District Court, S. D. New York. March 26, 1892.)*

DAMAGES—INJURY TO VESSEL—DUTY TO PREVENT SUBSEQUENT INCREASE OF DAMAGE.
    A canal boat sank at low water at defendants' wharf by their fault, and careened on her side at about 4:45 A. M. The tide began to rise about 6 A. M., and before the cargo was removed some portions of it were damaged. There had been men on the dock before the tide began to rise, but as they demanded double the ordinary steve-dores' wages, their services were refused both by the master and the foreman of the libelant. *Held*, that the well-settled rule of the obligation of the ship to use all reasonable diligence after an injury to prevent subsequent increase of damages, should have led the master to employ help at once, even at advanced wages; and that the owners of the canal boat could not recover for such damage to the cargo as might have been saved by employing such labor.

In Admiralty. On exceptions to commissioner's report.
*Robinson, Bright, Biddle & Ward* and *Mr. Hough,* for libelants.
*Horace G. Wood,* for respondents.

BROWN, District Judge. Exceptions have been taken to the commissioner's report upon the damage caused by the sinking of the libelant's barge, F. A. Murphy, at respondent's wharf through the fault of the latter. The ground of exception is that at least a part of the loss is attributable to the negligence of the libelant's men, in not removing the cargo at once, before it was injured by the rise of the tide.

The canal boat sank at low water, and careened on her port side at about 4:45 A. M. The tide began to rise at about 6 A. M. It was half past 9 A. M. before the removal of the cargo was begun in earnest. During this interval a considerable portion of the cargo, which consisted of barrels of flour, hay in bales, and feed in bags, which was all on deck, and which had shifted to port as the boat careened, was wet and damaged by the rising tide.

Upon the conflicting evidence I am not satisfied that at low water when the boat careened, there was any such depth of water on the lower rail as three or four feet. Besides the contrary testimony of the claimants, there are other undisputed circumstances as to the amount of the rise of the tide, the depth of the water, the slant of the boat, and the work of the men in the water, which indicate that the port rail was not at low water submerged to that amount. But whether that depth of water was exaggerated or not, there can be no doubt that a considerable part of the cargo was damaged through the rise of the tide five feet up to high water a little before 11 o'clock.

Between 5 and 6 o'clock in the morning some half a dozen men were on the dock willing to work, but demanding from 90 cents to $1 an hour wages, the regular wages of stevedores being only 40 cents an hour. The captain declined to employ them in removing the cargo, because he considered the wages exorbitant; and also because, as he says, he considered the men loungers and untrustworthy. At 7:45 in answer to a telegram, one of the foremen of the libelant arrived, who set to work about eight men to unload the cargo. After working for about 10 minutes they demanded from 50 cents to 60 cents an hour, which the foreman declined

to pay, offering 36 cents to 40 cents; whereupon they all stopped work, except one man who continued with the master and mate of the canal boat and two others, until half past 9, when the libelant's barge Lamokin with 12 other men arrived, who went immediately at work. These 17 were all that could work advantageously.

I am of the opinion that the demand of the men to be paid extra wages was not a sufficient reason for permitting the cargo to be damaged by the rising tide. The situation was one somewhat analogous to that of salvage, in the need of immediate help to extricate the cargo from threatened danger. For great additional damage would manifestly ensue unless the cargo was speedily removed before the rising tide should cover it. There was no question of the master's authority, nor of the ordinary wages of stevedores in such a case. I cannot conceive that a man of reasonable prudence, looking after the interest of his own property, would hesitate a moment under such circumstances to employ any effective labor that was at hand, without regard to the rate of wages demanded, within any such limits as the present case presents. It was therefore, the reasonable duty both of the captain of the canal boat, and of the foreman when he arrived on the scene, during the four or five hours that elapsed after the canal boat careened until the Lamokin arrived, to remove all the cargo that was possible, and to accede to the price of wages demanded, if other timely help was not procurable. That the men should demand extra wages for such a service, I do not consider any evidence against their character, or their efficiency; on the contrary, I think they had a right to expect some extra compensation in such an emergency. The obligation to use all reasonable diligence after an injury in cases of collision, or other maritime torts, to prevent subsequent increase of damages, is well settled in courts of admiralty; and the rule at law is similar. *The Baltimore,* 8 Wall. 377; *Warren* v. *Stoddart,* 105 U. S. 224, 229; *The Thomas P. Way,* 28 Fed. Rep. 526; *The City of Chester,* 34 Fed. Rep. 429, 430; *Pettie* v. *Tow-Boat Co.,* 1 U. S. App. 57, 62, 49 Fed. Rep. 464; *The Havilah,* 1 U. S. App. 138, 50 Fed. Rep. 331.

It is impossible to determine precisely how much of the dry cargo was damaged that would have been saved by the employment of the men who were willing to work. As it was, 100 bales of hay and about 12 barrels of flour were removed dry. This was a little more than half of the flour, and about two-fifths of the hay. The feed and grain were all damaged. The unloading was completed at about 10 P. M. the same evening. The loss on the damaged portion as found by the commissioner was the sum of $1,687.38.

Considering that the cargo could have been much more quickly handled before it was wet, and that so considerable an amount was removed dry with the few men employed before the tide rose, I am satisfied upon the evidence that had the men present and offering to work from the first been employed as they should have been, at least $400 of the damage would have been saved. So much, therefore, with interest, should be deducted from the commissioner's report, which is in other respects confirmed.