### THE ANTONIO ZAMBRANA.

### MECKE et al. v. THE ANTONIO ZAMBRANA.

### ACTIESELSKABET ANTONIO ZAMBRANA v. MECKE et al.

(District Court, S. D. New York. September 4, 1895.)

CHARTER PARTY—BARRANQUILLA—REFUSAL TO ENTER UNFREQUENTED MAGDALENA RIVER—BILL OF LADING — CUSTOMARY PORT — RETURN DELAYED — DAMAGES—REASONABLE TIME.

The steamship Z., drawing 13 feet, being chartered to run three months "between U. S. and ports of South America," cleared from Philadelphia with a cargo deliverable, according to the bill of lading, "at Barranquilla." For ten years previous to arrival, steamers of her class had not gone up the river, to the city of Barranquilla, 20 miles up the river, but had delivered their cargoes at Puerto Colombo, a mere place of delivery, from which there was transportation by rail to Barranquilla. The consignee insisted that the master should go up the river with the steamer, and that it was safe to do so. In making preliminary soundings, the channel way being wholly unbuoyed, the captain and the only local pilot lost their lives. Thereafter the mate was advised by the captains of other steamers that the attempt would be dangerous, and he was warned by the agent of the insurers that the insurance of the ship would be forfeited by the attempt to go up the river; he thereupon refused to make the attempt. The consignee refused to take the cargo at Puerto Colombo, and after three months of ineffectual endeavors at settlement the ship returned with her cargo, and brought this suit for charter hire; while the consignee, who was the principal in the charter, sued for damages for a breach of the charter in not going up to the river port of Barranquilla, and for the value of the cargo. *Held* (1) that the mate was justified in refusing to go up to the river port, and in returning with the cargo, upon the consignee's refusal to receive it at Puerto Colombo, there being no place for its storage; (2) that the ship could not recover for her delay at Puerto Colombo beyond a reasonable time after the ultimate refusal of the consignee to accept the cargo at the Puerto Colombo was known, and that the period of six weeks after arrival, up to the time of the expiration of the charter, was a reasonable and sufficient time, and recovery of damages beyond that period was disallowed.

This was a libel by Edward Mecke and another against the steamer Antonio Zambrana to recover damages for failure to deliver cargo. The owner of the ship (Actieselskabet Antonio Zambrana) filed a cross libel to recover damages for failure to receive cargo and for the detention of the ship.

Fred. W. Hinrichs, for Mecke et. al.

Goodrich, Deady & Goodrich, for the Antonio Zambrana and owner.

BROWN, District Judge. The above libel and cross libel were filed by the charterers and owners respectively of the steamship Antonio Zambrana, to recover the damages which each claims to have sustained through the delay and detention of the steamer in 1893, at Puerto Colombo, and her final return to New York without delivering her cargo.

The owners of the steamer had, on October 29, 1892, chartered the steamer to Howes & Co. of Philadelphia for a period of three months, with an option of three months longer, to be employed "between the United States and ports of South America" at the rate of £350 sterling per month. On the following December 23d, Howes & Co. sublet the same steamer for two months from that date to the libelants Mecke & Co. at the rate of £300 sterling per month, the other provisions of the subcharter being in accordance with the original charter; but no reference was made in the subcharter to the original charter. By the provisions of both charters the captain was to be under the orders and directions of the charterers, as regards "employment, agency, or other arrangements"; and both charterers agreed to indemnify "the owners" from all consequences or liabilities that may arise from the captain signing bills of lading or otherwise complying with their orders and directions." In the charter to Mecke & Co. no owners were named other than Howes & Co. The evidence shows that Mecke & Co. were acting merely as agents or brokers for Rafael Salzedo, of Barranquilla, who was the real principal, and whose chief object was the transportation of salt for the government from Manaure to the river port of Barranquilla, a trip of 80 miles. By directions of Salzedo, an outward cargo of coal and resin was loaded at Philadelphia, and a bill of lading presented to the master which was signed by him, providing for delivery at Barranquilla.

On the 8th of January, 1893, the steamer arrived at Puerto Colombo, which for the last 10 years has been the ordinary port of discharge of steamers loaded for Barranquilla. From that port there was railway conveyance to the river port of Barranquilla, which was distant about 20 miles up the Magdalena river. Salzedo, the consignee of the cargo, demanded that the vessel should proceed up the Magdalena river to the river port of Barranquilla, and he refused to receive the cargo at Puerto Colombo to be forwarded thence by rail. Formerly some steamers had gone up the Magdalena to the river port of Barranquilla; but during at least seven years prior to the arrival of the Zambrana, navigation of the Magdalena for steamers of her class had been abandoned as unsafe, and discontinued; and its reputation was that of an unsafe river port. The channel over the bar, about one-half mile wide, was uncertain and shifting. There were no buoys, nor stakes, nor signals; no tugs were available, and there was no government licensed pilot for that river, at least after the death of Astralaga; and the few other pilots

for Puerto Colombo do not seem to have been actually acquainted with any specified river channel, and preliminary soundings were necessary.

On the 11th of January, 1893, three days after arrival, Capt. Boe, on the demand of Salzedo, went out with the pilot Astralaga in a small boat to examine the channel, with reference to going up to the river port, in company with an insurance agent and four seamen. They all lost their lives in the attempt. Thereupon the command of the steamer devolved on the mate Stubb, who being advised by several masters of steamers at Puerto Colombo that the attempt to go up the Magdalena with the Zambrana was dangerous, and by the local insurance agent, that the insurance of the vessel would be thereby forfeited, he refused to go up the river with the steamer, or to make any further examination of the channel. He testifies, and in that he is confirmed by the American consul, that he offered to send the cargo by rail from Puerto Colombo to Barranquilla, and to advance the railroad charges thereon, leaving the question of responsibility for that item to be subsequently determined, and that this was refused by Mr. Salzedo. The latter denies this specific offer, though other parts of his testimony give it some confirmation. The only offer he testifies to is that he would accept the cargo if the master would pay the freight to Barranquilla, i. e., pay it unconditionally, which the mate rightly stated he had no authority to do. Salzedo's principal object, however, was to employ the Zambrana in the business of bringing salt up to the river port of Barranquilla. He was apparently liable to large damages to the government should he fail to do so; though the government, after the Zambrana's return, remitted its claim. He constantly insisted, therefore, that the Zambrana should go up the river; and that is probably the reason why no adjustment of their differences could be had as respects the delivery of the outward cargo; so that after numerous fruitless negotiations and delays, Capt. Krohg, who had meantime been sent out by the owners to take charge of the vessel, left Puerto Colombo suddenly on May 2d, just in time to escape a further arrest of the vessel, and brought the cargo to New York, where it was sold on account of Mecke & Co., the shippers. Thereupon the above libel and cross libel were filed.

The litigation in this matter has been laborious; the witnesses examined upon commission, numerous; and great differences are found in the testimony as to the navigability of the river Magdalena. All who testified on the subject, however, concur in the fact that the navigation of the Magdalena for vessels of the class of the Zambrana had been abandoned for at least seven years previous. The testimony and correspondence leave no doubt in my mind that Mr. Salzedo believed that steamers of 10 or 12 feet draft could go up the river if they would only make the attempt; and that he intended to force, if possible, the resumption of navigation by such steamers up the Magdalena. "The weak part of the affair," however, as he wrote Mecke & Co. (cited in their letter of April 20th), is, that "it was not stated in the charter party that the steamer should go to the river port of Barranquilla"; the customary place of dischar-

ging steamers' cargoes for Barranquilla being at Puerto Colombo. To Salzedo's complaint on account of this omission, the libelants Mecke & Co. say in reply, that the insertion of the river port was "not necessary, because, as you [Salzedo] state, it is possible for steamers drawing 14 feet to pass the bar without danger; and if we had put this clause into the charter party, the charter of the steamer, which you needed so urgently, would not have been made."

From this explicit statement of Mecke & Co., I do not infer that there was any fraudulent concealment of the wishes of Salzedo from Capt. Boe, but only that Capt. Boe refused to agree positively to go to the river port of Barranquilla, and would only leave that question to be settled by what should be ascertained concerning the safety of navigation up the river and the available water after arrival there. His own conduct after arrival, the conduct of Salzedo in sending him out with Astralaga to verify the latter's report as to the depth of water, and the testimony of Salzedo himself, corroborate this inference.

No weight can be given to the circumstance that the bill of lading provided for delivery "at Barranquilla," for several reasons: (1) Because it is obvious that Capt. Boe did not mean by this a delivery at the river port of Barranquilla; the ordinary place of delivery of Barranquilla cargoes from such steamers being at Puerto Colombo. (2) Because under this custom, a delivery at Puerto Colombo would be a good delivery, unless the vessel could properly go up the river port of Barranquilla without in the least compromising her safety; and in the latter case, under the terms of the charter party, she could be required to go there, the same as to any other safe port within the limits specified in the charter, without regard to the contents of any bill of lading. (3) Because the ship was loaded by the subcharterer alone, and as between the owner and the subcharterer the bill of lading is not treated as designed to add to the charter obligations; the master had no authority to make additions; and as respects the choice of ports, it is plain from what is said above, that the master in signing the bill of lading did not act upon any knowledge, or choice of his own, but solely upon the request, and the direction, of the subcharterer, and at his risk as regards the propriety of the port specified. "It is implied," says Maclachlan (Shipp. p. 426), "that the port to be named for delivery shall be such at the time of entry as the ship may enter without compromising her safety." It must also be a real and existing port, within the recognition of mariners, and of maritime usage. The Alhambra, 6 Prob. Div. 68.

The case mainly turns, therefore, on the question whether the river port of Barranquilla was at that time such a recognized port, and such a reasonably safe port for steamers of the class of the Zambrana, drawing about 13 feet of water aft, as required her to enter, or to make more endeavors to enter than were made. Upon this question, the fact that river navigation for vessels of the class of the Zambrana had been abandoned for at least seven years preceding, is a strong circumstance in support of the ship's refusal. The charterer had no right to make experiments with the ship, even at his

own expense; certainly not, when the charter gave no such authority, and did not even mention Barranquilla at all. The disuse of the river is not sufficiently accounted for by the suggested interest of the Atlas Steamship Company in the new railroad at Puerto Colombo; since many other steamers than those of that line abandoned the river and delivered cargoes for Barranquilla at Puerto Colombo. In the conflict of evidence it is to be noticed, that the majority of those who were under responsibility for their vessels regarded the river as unsafe and hazardous. As a rough sea and breakers across the bar were not uncommon, 3 to 4 feet of water in excess of the ship's draft were necessary to safety; i. e., in this case, from 16 to 17 feet of water.

The testimony taken by commission shows a number of witnesses who testify to a depth of from 16 to 22 feet as the least water in the channel over the bar at different times from September, 1892, to January 5, 1893. There is no assurance, however, of the continuity of these soundings, nor of the number of soundings taken in crossing the bar; no vessel of 13 feet draft had for years crossed the bar; different witnesses on the Burlingham in September, 1892, give the different depths of least water as 15 feet, 16½ feet, and 18 feet. Colina says 16 feet in November; and it is a singular circumstance, that though January was in the dry season, the depth of water reported to Salzedo increased rapidly as the arrival of the Zambrana was expected; Astralaga reporting, on January 8, 1893, 22 feet as the least depth, and to this the carpenter Marcias testifies. These differences both upon the same trips, and upon successive trips, cast great suspicion on these reports. They are all unofficial. It is impossible to accept the report of Astralaga as trustworthy. His death prevented any verification of it by his testimony, and there are no circumstances given by Marcias which entitle it to credit as a careful measurement; while the entire loss of the sounding expedition in charge of Astralaga, when he took Capt. Boe to test the depth of the passage, casts additional doubt on Astralaga's competency and trustworthiness as a pilot and a seaman.

Still further doubt is cast upon the trustworthiness of the reported soundings, by the previous letters of Salzedo. In the letters of June 11 and July 23, 1892, he writes that he shall need "a steamer which, when loaded, does not draw more than 10 feet, so that she may enter into the boccas of the Magdalena river to the river port of the city" (i. e. as distinguished from the outer port of Puerto Colombo). When Mecke & Co. reply that a sea-going steamer of only 10 feet draft is difficult to obtain, he writes on September 20, 1892, that "a steamer drawing 12 feet, when entirely loaded, would suit me;" and so late as December 24, 1892, after all the alleged soundings of September and November were reported, and only a fortnight before the Zambrana arrived, he writes: "You may send me another steamer [than the Unita] with these conditions; drawing, when entirely loaded, not more than 12 feet." The Zambrana when fully loaded, drew 14 feet, and on arrival at Puerto Colombo, about 13 feet. Before this trouble arose, therefore, and up to within a fortnight of the Zambrana's arrival, it was the deliberate judg-

ment of Salzedo himself, repeatedly expressed, that in order to go up the Magdalena to the river port of Barranquilla, the draft must not exceed 12 feet. Such evidence from the party most interested, while planning for safe navigation, and before any bias arose from the stress of subsequent events, is of very persuasive force, confirmed as it is by those shipmasters who stood charged with responsibility for their vessels, and confirmed also by the uniform practice of steamers to avoid the river port for the seven years preceding.

It is to be further observed that the question here is not whether upon the proofs subsequently taken in these cases it might be found that the Zambrana could, or could not, have safely crossed the bar; most doubtful, for the above reasons, as I consider that question to be; but the question here is, whether upon the facts and circumstances as presented to the mate Stubbs, he was bound to make any further attempts after the loss of the captain. The main facts were these: His first duty, the safety of the ship; neither the charter nor the bill of lading mentioning the river port of Barranquilla; the reported soundings, discordant; the last report of Astralaga so much exceeding all prior ones as to be scarcely credible; Salzedo pressing him to go up the river under the stimulus of strong self-interest, but refusing to agree to indemnify the ship for the attempt; other shipmasters present and long acquainted there, warning him that the attempt was hazardous and unsafe; and the insurers notifying him that his insurance would be forfeited; his captain already sacrificed in the attempt, and Astralaga, the only licensed river pilot, also drowned in the same undertaking; the mate, the only person left competent to take charge of the ship; the river port for seven years abandoned as unsafe for steamers of the Zambrana's class; no efforts by the government to restore its ruined credit; no buoyed channel; no official soundings taken, though requested by the mate, and no consistent or well-authenticated private soundings; and no certificated pilot left to conduct the ship. Under such circumstances, I think the demand of the mate for official and credible soundings as a condition of any further attempts to go to the river port was justifiable; and that he was not under any obligation to conduct what would have been virtually an experiment for Salzedo's benefit, and at the ship's expense, in determining whether navigation for steamers to the river port might be safely resumed.

Whatever may have been the contention or belief of the inhabitants, or the authorities at Barranquilla, who were interested in having steamers come up to the river port, I must find that its fixed reputation and character among mariners and marine insurers was that it was unsafe and hazardous, and that it was not an existing port at all for vessels of the class of the Zambrana; and that there had been no such official soundings, or such repeated consistent and credible reports of private soundings, as to give assurance of any sufficient or established channel, such as to make navigation safe for the Zambrana; and no such marking of any channel by buoys, signals, or ranges, as would be requisite to the reopening of the river to navigation for such steamers, so as to make it a real and existing port within the fair recognition of mariners, and so as to authorize

the charterer to require the Zambrana to go up the river, and to continue that navigation during the charter period. The attempt would have been, as above said, essentially an experiment, which nothing in the charter authorized Salzedo, the virtual charterer, to make, or to demand of the master to make, at the ship's risk. The consignee was consequently bound to accept the cargo at Puerto Colombo, as the usual place of discharge of such steamers bringing cargoes for Barranquilla, and the charterers have no claim to damages for the delay.

The inflexible demand of Salzedo that the Zambrana should go up to the river port, and his persistent refusal to receive the cargo at Puerto Colombo, were the cause of all the subsequent complications. Stubbs, the mate in charge, was finally thrown into prison, and the vessel was fined; there were no storehouses at Puerto Colombo where the cargo would be received, and where it could be stored on the consignee's account; and there was consequently no final recourse but to bring it away. The vessel was fortunate in getting away when she did to avoid further arrest, detention and loss.

I do not find in the evidence, however, any sufficient reason why the vessel might not and should not have left Puerto Colombo much earlier than she did, after the positive and reiterated refusals of the consignee to accept the cargo there were known, as well as the ship's inability to store the cargo there on the consignee's account. I must, therefore, disallow the claim of the owners for charter hire beyond February 23, 1893, the end of the charter period, which afforded a sufficient time for the ship's return to New York after the above facts were fully known. The owners are entitled to recover for the last half month's hire unpaid, less the sum advanced by Salzedo in Puerto Colombo to the mate, and also less the net proceeds of the cargo sold in New York. I must disallow any claim for damages to Mecke & Co., as I do not find on the part of the ship any breach of the charter obligations.