CONSTANTINE & PICKERING S. S. CO. v. WEST INDIA S. S. CO.

(District Court, S. D. New York. October 30, 1912.)

1. Shipping (§ 54*)—Charterer's Liability for Injury to Vessel—Mooring to Private Buoys.

　　A charterer, under a charter requiring the vessel to discharge at any dock designated by the consignee, but where she could "lie always afloat," who directs her to moor for discharge to private buoys, where she is injured by taking bottom because of the shallowness of the water or the dragging of the buoys, is not liable as a wharfinger, who is bound only to exercise reasonable care and diligence for the safety of his berths, but for breach of the express terms of the charter, which required him to furnish a place where the vessel could lie afloat under any conditions reasonably to be anticipated.

　　[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. Shipping (§ 54\*)—Liability of Charterer for Injury to Vessel—Contributory Negligence.**

In such case, however, the charterer may lessen the amount of damages for which he is liable, by showing that the navigators of the vessel, after knowledge of the danger, negligently failed to take any measures to prevent the injury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.\*]

In Admiralty. Suit by the Constantine & Pickering Steamship Company, owner of the steamship Kingswood, against the West India Steamship Company, for breach of charter party. The S. W. Bonsall Timber Properties, Limited, was impleaded by respondent. On final hearing. Decree for libelant for half damages.

The libel (for breach of charter party of steamship Kingswood) was brought by owners to recover from charterers (a) compensation at a rate higher than the charter rate for detention and use of the vessel after expiration of time charter, and during a period when the market for vessels of the class had risen; and (b) damages caused by the steamer's taking the ground while moored to two buoys in the vicinity of Bergen Point, Newark Bay, where she had been directed to moor and unload while under the charter party, which contract contained the proviso that at the port of discharge steamer should proceed "to such anchorage or safe dock to discharge cargo as ordered by consignees. Steamer, however, to lie always afloat." The respondent, admitting itself to be the charterer of the Kingswood, alleged that the vessel moored off Bergen Point by order of the subcharterers and for the purpose of discharging the subcharterers' cargo, and accordingly by petition brought into the suit the above-named Bonsall Timber Properties, Limited. At the trial respondent admitted its liability for the detention and use of the vessel at a rate of compensation above that provided for in the charter, and on this question agreed to go to a reference. The second item of libelant's alleged damages was therefore the only matter litigated.

John M. Woolsey, of New York City, for libelant.

Clarence B. Smith, of New York City, for respondent.

Adam K. Stricker, of New York City, for Bonsall Timber Properties, Limited.

HOUGH, District Judge (after stating the facts as above). The Kingswood came to the mooring place complained of on October 31, 1911. During the preceding summer the Bonsalls had at their own expense established two buoys in front of their place of business at Bergen Point and on Newark Bay, a short distance below the railway bridge of the New Jersey Central Road. It is shown that the buoys were located under the direction of the supervisor of anchorages, and on June 23, 1911, mariners were officially notified that two "first-class can white" mooring buoys had been established "in about 19 feet of water," and were to be "maintained continuously by the S. W. Bonsall Timber Properties, Limited, of New York City and Bergen, New Jersey."

According to the charts in evidence, the buoys were actually situated in about the depth of water given (and perhaps a little more) at mean low tide, but very near much shoaler water. The buoys lay in a line approximately north and south, with the channel to the west-

ward, and I think it evident, according to the chart soundings, that a vessel drawing 11 feet would take the ground on her easterly side, if she drifted or moved 100 feet easterly from the line of buoys. It would seem that soundings in a place like Newark Bay could not long remain reliable; but there is no better evidence before the court.

The Kingswood is a vessel of 1,205 tons net, and the only craft of her size which down to the time of trial ever moored to these buoys. Pursuant to orders given by the subcharterers (Bonsalls) the Kingswood moored head and stern, pointing northerly, on October 31st. The first mate declares that:

"As soon as we tied up, we dropped the lead over, and found it was 10 feet just inside of the ship on the shore (i. e., easterly) side of the vessel."

It is alleged in the libel that on—

"November 1st, while the vessel was moored to these buoys, they dragged, and the vessel took the ground, doing certain damage to her hull, shaft, and machinery."

The depositions of the master and mate of the Kingswood satisfy me that the first dragging did occur on November 1st, although the witnesses sometimes say that it happened on the day of their arrival, and at other times on the day alleged in the libel. The matter is only important in ascertaining when the officers of the Kingswood took their first additional measure of precaution. It is believed that they did nothing until November 1st, when, having observed that the "buoys began dragging home" when we "commenced wheeling on the head mooring," they dropped the port anchor. Any investigation would have shown that the danger to be anticipated (if any) was a soft mud bank very near the vessel's starboard side, and the anchor on a short cable dropped perpendicularly from her hawse pipe was useless to prevent stranding under the combined influence of a northerly or westerly wind and the ebb tide.

As matter of fact, the wind shifted (according to the record) to northwest about midnight of October 31st, and blew mostly from the north and northwest during all of November 1st. On that day the Kingswood's master notified his charterers, not that he was aground, but that he had been informed that his "steamer is lying on a line of pipes communicating with" certain oil works on the adjacent shore. The captain testifies that his vessel got aground on the morning of November 1st, but that did not prevent his leaving the ship and staying away most of the day, and he admits that she was "lightly on ground." The weather record shows no wind on November 1st above 34 miles per hour, and that only for a brief period. From all the testimony hitherto considered, I am not persuaded that any damage resulted from the grounding of the Kingswood on November 1st, if such grounding occurred.

For the succeeding six days the wind was prevailingly from west to north, and on November 7th it blew all afternoon and evening quite strongly from those directions, rising as high as 64 miles per hour. It is testified that this wind blew the vessel "further ashore," and, while no physical injuries were discovered at the time, it is asserted

that later (without having been on ground in the meantime) it was discovered that certain pipes were broken and the cement in the neighborhood of the ballast tanks displaced.

When the master was examined (by deposition), he was shown what purported to be "a copy of letter dated November 8, 1911, addressed to" Bonsalls. He identified the copy letter, and it was marked "Exhibit No. 10." But this exhibit, when shown to the court, bears date November 1st, and contains a notification that the steamer "is lying aground, and I am informed resting on a line of pipes from the oil works." During all this time the Kingswood was being rapidly unloaded, the representatives of Bonsalls were on board daily, and they all depose that no oral complaint was made to them, or any of them, by the master or mate.

That these mooring buoys were capable of being moved by the action of the elements alone appears from what occurred during the last winter, when they were admittedly shifted from their position by the action of ice. Considering, therefore, the high wind of November 7th, and the size of the Kingswood, and the subsequent history of the buoys, I am satisfied that she did on that day take the ground. That under such circumstances contact with the bottom would cause injury is probable, but the only definite piece of damage sworn to at this hearing is given by the engineer; but this is enough to warrant an interlocutory decree, without expressing any final opinion as to whether such grounding as occurred caused any substantial injury. Obviously, for whatever damages the Kingswood sustained by reason of an unsafe place to discharge the subcharterer (Bonsalls) is responsible.

[1] By analogy, the liability of a wharfinger has been invoked in favor of libelant; but this does not go far enough, for a wharfinger—

"does not guarantee the safety of vessels coming to his wharf, but is bound to exercise reasonable diligence in ascertaining the conditions of the berths thereat, and if there is any dangerous obstruction to remove it, or give due notice of its existence to vessels about to use the berths." Smith v. Burnett, 173 U. S. 430, 19 Sup. Ct. 442, 43 L. Ed. 756.

See, to the same effect, Smith v. Havemeyer (C. C.) 36 Fed. 927; Heissenbuttel v. Mayor, etc. (D. C.) 30 Fed. 456.

The charterer's liability does not rest on an implied contract, as does that of the wharfinger, but on the express terms of his charter party, which is to furnish, not only a place which he believes to be safe, but a place where the chartered vessel can discharge "always afloat." It is, I think, proven that with a wind of 64 miles and an ebb tide these mooring buoys could not sustain the Kingswood any more than they did the next winter's ice. In this harbor and in the month of November such winds are to be expected, and it follows that the charter obligation was not fulfilled by tendering a berth where the steamer could not lie afloat under conditions reasonably to be anticipated.

[2] Upon this breach of contract libelant rests, and up to a certain point rightly; but even a tort-feasor may lessen the amount of damages for which he is responsible by showing negligence, or even lack

of diligence, on the part of the person wronged, in failing to take steps to lessen certain or even probable damages. The Antonio Zambrana (D. C.) 70 Fed. 320; Scott v. Cornell Steamboat Co. (D. C.) 59 Fed. 638; Pennsylvania R. Co. v. Washburn (D. C.) 50 Fed. 335. The same principle applies here. If the mate's testimony is accepted, he knew before anything happened that there were but 10 feet of water on his starboard side. Both master and mate knew within 24 hours of arrival that the mooring buoys did not hold firm. It was perfectly possible, by moving the ship, to put out an anchor ahead, so that it would hold; but nothing was done for seven days of pleasant weather, until they were caught in a very ordinary gale of wind for the time of year. In my judgment the conduct of those in charge of the Kingswood invited disaster.

The libelant is entitled on this branch of the case to recover but half damages, for which a decree will pass against both the respondent and the Bonsall Timber Properties, Limited; execution to proceed in the first instance against the Bonsall Properties, and any unrecovered balance to be paid by respondent. No disposition is made of the question of costs at present, until it shall appear whether libelant is able to prove any substantial damage proximately caused by the grounding of November 7th.