## THE TYNEBRIDGE.

### NORTH OF ENGLAND S. S. CO., Limited, v. MUNSON S. S. CO.

No. 5563.

District Court, E. D. Virginia, Norfolk Division.

Feb. 14, 1934.

Hughes, Little & Seawell, of Norfolk, Va., for Munson S. S. Line.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City, and Baird, White & Lanning, of Norfolk, Va., for the Tynebridge and North of England S. S. Co.

WAY, District Judge.

This controversy arises out of operations under a voyage Charter dated July 20, 1932, between the owners of the British Steamship "Tynebridge" and the Munson Steamship Line by which the Munson Line chartered that vessel for "One West Indies Round Voyage" from Norfolk or Newport News, Virginia. The Tynebridge is a vessel of 4,-360 gross, 2,711 net, tons, is 360 feet long, with a 52½ feet beam and 27.6 feet draught.

A libel was filed by the Munson Steamship Line on September 24, 1932, which was after the expiration of the Charter, against the Tynebridge, seeking to recover back an over-payment of $560., made to the owners of the vessel on account of the Charter, which amount is admitted to be due and owing. On the 12th. day of December, 1932, the owners of the Tynebridge filed a cross-libel against the Munson Line seeking to recover for damages alleged to have been sustained by the Tynebridge as a result of the Charterer's sending the vessel to an alleged unsafe berth at Benito Juarez wharf, Progreso, Mexico, to take on a cargo of 11,550 bales of sisal hemp, destined for South Plymouth, Massachusetts. The pertinent provisions of the Charter Party here under consideration, are:

"Vessel * * * to be employed, in carrying lawful merchandise, * * * between safe port and/or ports in the United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico and/or Mexico and/or South America, not south of Cayenne, but excluding * * * all unsafe ports; * * *

"6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that the charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely lie aground."

The Tynebridge arrived off Progreso, from Martinque, August 26, 1932, in ballast, and was boarded by an official Pilot. At the time of arrival the vessel was drawing about 14 feet of water. The official Pilot before attempting to take her to Benito Juarez wharf, some two or three miles distant, inquired of the Master of the Tynebridge as to her draught, and upon the Master's informing him that it was about 14 feet, advised the Master that it would be necessary to pump out ballast, so as to reduce the vessel's draught before she could safely proceed to the wharf. Following that advice by the official Pilot, the Master caused ballast to be pumped out until the vessel's draught was reduced to 11 feet 8 inches. The Tynebridge under the guidance of the Pilot, then proceeded to the wharf and tied up, without grounding or sustaining any injury as a result of that movement.

The loading of sisal was thereupon commenced and continued, with short interruptions, until about 3:40 P. M., August 31st, at which time the Tynebridge had taken on 9,679 bales. While the Tynebridge was tied up at the wharf soundings were taken by her Chief Officer, pursuant to the Master's orders, twice and sometimes three times, daily, and the lowest depth shown by any of the soundings was 12 feet 6 inches. It was customary for vessels of 2,500 tons and over safely to lie aground at low water, while loading at Benito Juarez wharf. During the time the Tynebridge was tied up at the wharf she was shifted by her crew on two occasions, along the wharf for short distances seaward, apparently without grounding.

The tonnage and draught of the Tyne-

bridge was slightly in excess of that of any other vessel shown to have loaded at the wharf in question, the next largest being of 4,301 gross tons and a draught of 23.6 feet. Two other vessels of 4,155 gross tons each, and numerous vessels of between 3,000 and 4,000 gross tons are shown to have safely loaded cargo at that wharf. However, I do not consider the fact that the Tynebridge was slightly larger than the other vessels as at all decisive of the case, since, whether a vessel of her size and tonnage went aground or remained afloat at Benito Juarez wharf, depended almost entirely upon the quantity of ballast and cargo which it had aboard.

It was contemplated by the representative of Munson Line at Progreso and the Master of the Tynebridge that as much of the cargo as could be safely loaded at the wharf would be taken on there and that the vessel would then proceed to the anchorage outside to finish loading. I think it is clear from the circumstances disclosed by the testimony that the quantity of cargo which could be taken on safely by the Tynebridge at the wharf, was left to the judgment of the Master and officers of that vessel, although in his testimony the Master denies that.

At 3:40 P. M., August 31st. when the Tynebridge stopped loading at the wharf, her draught had increased from 11 feet 8 inches to 12 feet 1 inch forward and 11 feet 11 inches aft, as indicated by soundings taken by her First Officer. The tide was then ebb and the Master of the Tynebridge, not considering it safe at that time to attempt to undock and proceed to the anchorage outside the harbor, postponed that maneuver awaiting higher water.

The official Pilot went aboard the Tynebridge shortly after four o'clock on the morning of September 1st. for the purpose of piloting the vessel from the wharf to the anchorage where she was to finish taking on cargo, but the representative of the Munson Line did not go to the wharf until 6:30 or 7 o'clock that morning.

When the vessel's engines were first started, which occurred about 4:20 A. M., it became apparent almost immediately that the Tynebridge was partially aground forward, so that instead of backing out from the wharf her stern was merely swinging away from and then towards the wharf while the bow remained stationary. The tide was then rising and the depth of water at the wharf increasing, and it was or should have been apparent to the Master of the Tynebridge that if he waited until later in the day when the tide was high the work of getting his vessel away safely, would be greatly simplified and danger of damaging the vessel's machinery and hull by such movement eliminated. However, the Master, without waiting longer for higher water and on his own responsibility, undertook to force the vessel off ground, by use of her engines and continued such efforts for approximately two hours. It appears from the Master's testimony that as early as 6:40 A. M., the official Pilot advised him to discontinue his efforts to get the vessel off, until the water was higher. With respect to that the Master testified: "The pilot asked me to stop. He said, 'Captain, its no use. You will have to wait now until about twelve or one o'clock until the water comes up.'" In disregard of the official Pilot's advice, the Master thereafter worked his engines from 9:05 until 9:30, from 11:05 to 11:15 and again at 11:30. At 12:20, which was about the time indicated by the official Pilot, the vessel was floated and proceeded safely to the anchorage grounds. There the vessel finished taking on cargo, and later proceeded to South Plymouth, Massachusetts, discharged her cargo, and from South Plymouth proceeded to Newport News, Virginia, and was placed in drydock for overhauling, which cross-libelant contends was rendered necessary as a result of the vessel's being aground at Progreso.

It appears from the testimony of cross-libelant's witnesses that the Tynebridge was, prior to going in drydock at Newport News, left in drydock at Barry, England, in February, 1932; that after leaving drydock at Barry the Tynebridge took on a cargo in England and proceeded to Martinque, where the cargo was discharged; from Martinque to the Port of Spain, Trinidad; from Trinidad to Galveston, Texas; Galveston to Patras, Greece, thence to Suda Bay and Salonica; from Salonica to Poti, a Russian port in the Black Sea; from Poti, to Baltimore; from Baltimore, to Norfolk; from Norfolk to Martinque, and thence to Progreso, Mexico.

In his testimony, the Master of the Tynebridge claims that on September 2, 1932, before leaving Progreso, he delivered a written protest to the representative of the Munson Line with regard to the alleged damages, notifying Munson Line that it would be held responsible therefor. The Munson Line representative at Progreso emphatically denies that any protest or claim was made by the Master. It is significant that the alleged written protest which the Master testifies he handed to the Munson Line representative at

Progreso on September 2, 1932, was still in the Master's possession and was offered as an exhibit with his deposition taken at Baltimore January 26, 1933. Under all the circumstances, the Court has concluded that the alleged protest is the result of an afterthought, and that no protest, either oral or written, was ever made at Progreso by the Master.

In the testimony and arguments some stress has been laid upon the fact that Benito Juarez wharf was completely exposed to wind and weather. While that is a fact appearing in the case, it is also equally true that the weather was calm while the Tynebridge was at Progreso and that no damage was occasioned as a result of the exposed position of the wharf.

It is urged by cross-libelant, in substance, that the berth at Progreso was unsafe and that as a result of the Tynebridge's being aground there and of efforts necessary to get her afloat, her engines were strained and fouled, her machinery damaged, and her hull scarred and dented, and that under the provisions above quoted from the time Charter, libelant is responsible for such damage. I think it is clear that her being partially aground did not in itself occasion any damage, but that the damage, if any, both to engines and machinery and to the hull, resulted from the efforts of the Master to get her afloat.

Some of the authorities relied on to support cross-libelant's contention will be reviewed.

In Carroll v. Holway (D. C.) 158 F. 328, a schooner was damaged as a result of resting on the bottom at low tide. It was found that the bottom of the dock was hard, and that where the vessel's 'midships came, the water was 5 feet deeper than at her stem and 4 feet deeper than at her stern, and in Sterns Lumber Co. v. John H. Rice Co. (D. C.) 260 F. 434, it was disclosed that the schooner at low water had rested on a gravel, hard bottom, containing many cobble stones and a boulder about a foot in diameter. The water where the bow had rested was 8.5 feet deep and where the stern had rested, 7.8 feet deep, while it was 10.9 feet deep at 'midships.

In Crisp v. U. S., etc., S. S. Co. (D. C.) 124 F. 748, the Charter Party provided that the wharf for discharging must be "where the ship can always safely lie afloat" at any time of tide. While passing through a draw bridge in approaching the dock, the vessel struck upon some obstructions under the water, causing delay and expense, which it was held should be borne by the Charterer and not by the owners.

In Constantine, etc., S. S. Co. v. West India Co. (D. C.) 199 F. 964, the Charter Party provided that the vessel was to be taken to docks where she could "lie always afloat," and the vessel was injured because of the shallowness of the water.

In Merritt v. Sprague (D. C.) 191 F. 627, the agreement required the Charterer to "guarantee a safe and suitable berth for loading and discharging, with sufficient water for reaching it and lying therein safely." The testimony as to the condition of the berth's being highly conflicting, an expert was appointed by the Court to examine the berth and reported that the bottom was very hard and stoney, and that the bed of the river uncovered at low tide both above and below the berth, was so thickly covered with cobble stones that 50 feet away, it looked like an old fashioned gutter with cobble stones. A diver employed by the expert found in the berth at a point where the vessel had rested a boulder estimated to be 4 feet by 6 feet at the top with a rise of from 18 to 24 inches, and in addition numerous smaller boulder-like rocks.

In Look v. Portsmouth, etc., Ry. (D. C.) 141 F. 182, the owner of the dock, as agent for the consignee, a street railway company, had charge of discharging a cargo of coal from the vessel damaged. During that work, to avoid expense, he moved the vessel to such a position that its headgear projected over feed wires of the street railway. Neither the Master nor the consignee's agent had actual knowledge of the danger. While so moored, the vessel's chains came in contact with the feed wires and the vessel was thereby set afire.

It seems to me that the facts of the instant case are clearly distinguishable. Here, the Master of the Tynebridge knew before he left anchorage on August 26th, that the water at Benito Juarez wharf was shallow, and he remained constantly advised, while there, of its depth through frequent soundings taken by his First Officer. The increase in the vessel's draught as she continued to load was known to him, and the quantity of sisal which could safely be taken on at the wharf left to his judgment. Apparently more cargo was taken on than was advisable, unless the Master intended to wait until flood tide was at its maximum before attempting to leave the wharf. He knew almost immediately after the engines were first started (about 4:20 on

the morning of September 1st.) that the water was still too shallow for the Tynebridge, with the cargo she had aboard and with due regard to her safety, to attempt at that time to shift to the anchorage grounds, and admits that the official Pilot advised him to that effect as early as 6:40 A. M. Certainly, no one could have been more aware than the Master was, of the danger of damaging and fouling the vessel's engines and machinery, and injuring the hull, incident to such efforts. Upon the whole case, I am of the opinion that the damages alleged did not result from taking the Tynebridge to an unsafe berth, but that they are clearly referable to the action of the Master, initially in loading too much cargo to move from the wharf safely, except at high tide, and afterwards in failing or refusing to wait until the water was of sufficient depth to enable him to move in safety.

A decree in favor of Libelant for $560. and dismissing the cross-libel will be entered upon presentation.