## THE HALO.

### CITIES SERVICE TRANSP. CO. v. GULF REFINING CO.

District Court, S. D. New York.

Nov. 19, 1934.

Hatch & Wolfe, of New York City (Carver W. Wolfe, of New York City, of counsel), for libelant.

James L. Gillingham, of New York City, for respondent.

PATTERSON, District Judge.

The suit is by the owner of a steamer against the charterer, for damage to the hull caused by resting on bottom while at a berth.

The libelant owned the tank steamer Halo. On June 27, 1928, it chartered the steamer to the respondent. In the charter party the Halo was represented to have a capacity of 75,000 barrels of oil, 10 per cent. more or less. The charter was for a voyage to "Paraguana, Venezuela, or so near thereunto as she may safely get (always afloat)," there to load a full and complete cargo of crude oil and to proceed to an Atlantic port of the United States as the place of delivery. It was further provided (clause 6): "The Steamer shall load and

discharge at a place or at a dock or alongside lighters reachable on her arrival, which shall be indicated by Charterers, and where she can always lie afloat any lighterage being at the expense, risk and peril of the Charterers."

The Halo arrived at Las Piedras, a port of Paraguana, on July 14th, and was docked at a pier maintained by the Venezuela Gulf Oil Company. The latter is a corporation affiliated with the respondent, both being subsidiaries of the Gulf Oil Corporation. The berth alongside the pier was chosen by one McPhee, port captain of the Venezuela Gulf Oil Company, who piloted the ship to the pier. McPhee told the master of the Halo that there was sufficient water there to load; that other ships of that size and probably larger had been loaded there. On several prior voyages the Halo had been at this berth without grounding. On the morning of July 16th, when some 81,000 barrels had been loaded, the master noticed that the vessel did not have the expected draft. He stopped the loading. Soundings then taken revealed that the vessel was aground fore and aft, the bottom proving to be hard sand. There was a wind from the land at the time, which had the effect of blowing the water out and causing low water at that berth. The master backed off into deeper water, apparently having no trouble in getting free. The ship then proceeded to New York and delivered the cargo. On dry dock several plates on the bottom were found bent and scared.

I am of opinion that the respondent is liable for the damages sustained.

Under the charter party the charterer had the right to select the place of loading cargo. It was stipulated that the place selected must be one where the ship "can always lie afloat." There was then an express covenant by the charterer to see to it that the berth selected was one where the ship could load without touching the ground. This covenant the charterer broke, subjecting itself to liability for the ensuing damage. Crisp v. United States & Australasia S. S. Co., 124 F. 748 (D. C. N. Y.); Constantine & Pickering S. S. Co. v. West India S. S. Co., 199 F. 964 (D. C. N. Y.).

In defense of the suit, it is claimed that the grounding was caused by the master of the Halo, through taking an excessive quantity of cargo on board and also through failure to take soundings in good season. It is true, of course, that if the grounding, though a breach of covenant by the charterer, was brought about by act of the owner or some one for whom the owner was responsible, there would be no liability on the charterer's part. A breach of contract is excused if brought about by act of the other party. It is also true that under this form of charter party the owner did not put the vessel into possession of the charterer. The master and crew remained the servants of the owner, and for the master's fault the owner is answerable. Reed v. United States, 11 Wall. 591, 20 L. Ed. 220; The Penza, 9 F.(2d) 527 (C. C. A. 2). But there was in fact no dereliction by the master. As for cargo, it was the owner's obligation to receive "a full and complete cargo." The master took on 81,-000 barrels. This cargo was within the warranted capacity of 75,000 barrels, with a 10 per cent. margin more or less, and cannot be deemed an overloading. As for the omission to take soundings, the master had the right to rely on the charterer performing its contractual duty of directing the ship to a safe berth. Moreover, he had been assured by the port captain, who represented the charterer and who picked the berth, that it was a safe berth. Under such conditions the master was under no duty to sound. The Eastchester, 20 F.(2d) 357 (C. C. A. 2). See, also, The Bleakley No. 76, 54 F.(2d) 530, 532 (C. C. A. 2). The fault in the case was that of the charterer's representatives.

I have not overlooked testimony offered by the respondent and tending to show that the depth of water at the berth exceeded the Halo's draft, and also that the bottom was soft mud. The weight of evidence, however, indicates that the Halo actually was aground at this berth, that the bottom was hard sand, and that the hull was damaged by reason of the grounding.

There will be a decree for the libelant.