310 F.2d 169
 PARAGON OIL CO., Inc., Libellant-Appellee,
v.
REPUBLIC TANKERS, S. A., Respondent-Appellee,
Yacimientos Petroliferos Fiscales, erroneously sued as Yacimientos Petroliferos Fiscales, S. A., Respondent-Appellant.
REPUBLIC TANKERS, S. A., Petitioner-Appellee,
v.
YACIMIENTOS PETROLIFEROS FISCALES, Respondent-Impleaded-Appellant.
 No. 17.
 Docket 27401.
 United States Court of Appeals Second Circuit.
 Argued October 2, 1962.
 Decided November 5, 1962.
 
 COPYRIGHT MATERIAL OMITTED Charles A. Ellis, Ralph Bosch, New York City, for appellant.
 Eli Ellis, Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for appellee Paragon Oil Co., Inc.
 David Gilchrist, New York City, for appellee Republic Tankers, S. A.
 Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 Paragon Oil Co., Inc., a New York corporation alleging itself to be owner and operator of the tanker Greenpoint, filed a libel in the District Court for the Southern District of New York against Republic Tankers, S. A., a Panamanian corporation, and Yacimientos Petroliferos Fiscales (hereafter YPF), an agency of the Argentine Government, for damages sustained by the Greenpoint on April 17, 1957, when she grounded near a dock in Buenos Aires harbor. At the time the tanker was under a voyage charter to Republic, which in turn had entered into a contract of affreightment with YPF. Republic, acting by a proctor who was an associate in the firm representing Paragon, impleaded YPF. After a trial Judge Levet sustained Paragon's claim against Republic and Republic's against YPF; Paragon's direct claim against YPF was dismissed. YPF alone appeals; we affirm.
 
 
 2
 The evidence warranted the judge in finding the facts to be as follows:
 
 
 3
 On March 16, 1957, Paragon, by Circle Shipping Co., Inc. as Agent, chartered the Greenpoint to Republic for a voyage from Puerto La Cruz, Venezuela, to Buenos Aires. The charter party contained a safe berth clause. Previous to this, in December, 1956, YPF had entered into an agreement with Paragon Oil Company, Inc. (Del.) for the purchase of seven cargoes of fuel oil (Purchase Order NY-1970) and a complementary Affreightment Contract with Republic for the transportation of these cargoes to Buenos Aires or LaPlata in the Argentine (Purchase Order NY-1971). The Affreightment Contract, like so many commercial agreements, "carries its endorsements like bunting flapping in all directions," Devlin, Samples of Lawmaking (1962), 35. One of these appendages was a photostatic copy of some clauses from the same form of charter party, Warshipoilvoy (Rev.), used by Paragon and Republic in their Voyage Charter, among them the following:
 
 
 4
 "6. SAFE BERTH, SHIFTING. The Vessel shall `lead and' discharge, at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided that the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer * * *".
 
 
 5
 Thus, so far as here relevant, the Voyage Charter and the Affreightment Contract had identical safe berth clauses. Although a typewritten addition to the photostat explained that "The word Charterers do [sic] not mean that Yacimientos Petroliferos Fiscales had chartered any ships, in view of the fact that Purchase Orders NY-1970 and NY-1971 are only one order with condition C & F, as shown in the corresponding Purchase Orders", it is plain that YPF assumed any obligations which the printed form specifically imposed on a "Charterer". The only other clause in the Affreightment Contract that needs to be mentioned at this juncture is one reading:
 
 
 6
 "For your information the tankers which exceed 31 feet draft in fresh water, fully loaded, might require lighterage in Recalada, which expense, if any of course will be for seller's account because of the conditions C & F of combined Purchase Order NY-1970 and NY-1971. Other lighterage, if any, at discharge port to be for account of Y. P. F."
 
 
 7
 The Greenpoint had an agent, Milanowski, at Buenos Aires; he was appointed, as he said, "By the owners, the Republic Tankers, S. A., and by Circle Shipping". The Greenpoint kept Milanowski advised of its progress down the South American coast; he passed this information on to YPF, ultimately informing it that the tanker would arrive on April 16, 1957, at Recalada and with high tide would proceed to Interseccion.[1] On April 15, YPF told Milanowski that the Greenpoint was to take berth B, C or D in the South Dock at Buenos Aires; on April 16, it confirmed Berth C. Having been instructed by YPF "to take a chance of the exceptionally high tides prevailing during the last days and enter ship without lightering, if possible," Milanowski radioed the Greenpoint on April 16:
 
 
 8
 "Advise when Recalada pilot on board and indicate ETA Interseccion where would lighter if necessary stop however if recent high tides prevail try enter south dock Baires without lightering * * *".
 
 
 9
 Consistently with this, although on April 16 YPF had assigned a vessel to lighter the Greenpoint at Interseccion, it later cancelled the order. The Rio de la Plata pilot, Granelli, who boarded the Greenpoint at Recalada on April 16, found her draft to be 30.8" both fore and aft; his deposition does not make clear whether this was a salt or fresh water reckoning. Upon the vessel's arriving at Interseccion early in the morning of April 17, Granelli was relieved by port pilots; they advised that, because of the continued high tides, there was sufficient water for the tanker to proceed directly to the berth without lightering. Their advice proved correct; the Greenpoint arrived off South Dock C at 11:30 A.M. on April 17 without incident — only to find the berth occupied by the barge Esso Rosario.
 
 
 10
 On April 16 Milanowski had learned from YPF of the barge's being at Dock C; however, YPF advised that it would finish discharging at 5 P.M., and later that day confirmed that it had. Camerata, one of the port pilots who boarded the Greenpoint at Interseccion at 6:30 A.M. on April 17, advised her captain that Dock C was occupied by the barge but said he expected the barge would leave before the Greenpoint arrived. Milanowski had procured a tug to go out to Interseccion for lightering and attendant customs formalities if the tide required this. When he received a message from Camerata, that the Greenpoint was coming directly to her berth, he went there. Finding the Esso Rosario at the dock, he phoned the YPF office, and was told that "they were waiting for Esso to take the barge immediately out." By this time the Greenpoint was approaching the berth and could not longer be ordered to turn around and anchor in deep water. She anchored alongside the barge, some 35 meters from the dock. Her fresh water arrival draft was 30'8" forward, 31'00" aft, mean 30'10". The YPF workers on the dock did not have a hose long enough to discharge her. Around 1:30 P.M. the Esso Rosario departed under its own power. Attempts were made to move the Greenpoint to the dock, but she was aground. At the afternoon high tide, around 6:00 or 7:00 P.M. on April 17, there were further efforts to move her, again without success. Later that night she was brought within 25 meters of the dock; discharge began on the morning of the 18th. By that evening she had been lightened enough to be brought against the dock. Next day, April 19, the chief mate reported she was leaking; surveyors were called and found her bottom plating damaged.
 
 
 11
 Paragon's case against Republic and Republic's against YPF rested on a simple series of propositions: A place to which the Greenpoint could proceed and from which she could depart "always safely afloat" was warranted; it was not provided; therefore the warranty was broken and the warrantor was liable for the resulting damage. Although such simplicity is often delusive, courts should not spurn it when, as here, it is sufficient and appropriate.
 
 
 12
 YPF makes much of the fact that the Greenpoint's agent and captain both knew before her arrival at Buenos Aires that the Esso Rosario was at Berth C, and relies on the statement in Panama R. R. Co. v. Napier Shipping Co., 166 U.S. 280, 288, 17 S.Ct. 572, 575, 41 L.Ed. 1004 (1897), that the obligation to supply a safe berth "is manifestly inapplicable where the agent of the vessel is already acquainted with the danger, and assumes the responsibility of providing her with a safe berth." This reliance is misplaced, for three reasons. The first is that the Panama Railroad was only a wharfinger, who, in the absence of an express contract creating a higher standard, "does not guarantee the safety of vessels coming to his wharves," although he is "bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths." Smith v. Burnett, 173 U.S. 430, 433, 19 S.Ct. 442, 443, 43 L.Ed. 756 (1899). In contrast, Republic's liability to Paragon and YPF's to Republic was that assumed by a charterer, bound by the express terms of his contract "to furnish, not only a place which he believes to be safe, but a place where the chartered vessel can discharge `always afloat.'" Constantine & Pickering S. S. Co. v. West India S. S. Co., 199 F. 964, 967 (S.D.N.Y.1912) (Hough, D. J.) The second is that, on the judge's reasonable finding, YPF did not even meet the standard laid down for a wharfinger in Smith v. Burnett. The third is that, as the judge was warranted in finding, the Greenpoint's agent did not here "assume the responsibility of providing her with a safe berth."
 
 
 13
 We are not required to go so far as to hold that if Milanowski had known that on no account would Berth C be available on the Greenpoint's arrival and then had failed to give warning when warning would have availed, or if the captain had allowed the pilots to navigate the Greenpoint to a berth he knew would be filled, YPF would still be liable for the entire damage. See Park S. S. Co. v. Cities Service Oil Co., 188 F.2d 804, 806 (2 Cir.), cert. denied, 342 U.S. 862, 72 S.Ct. 87, 96 L.Ed. 648 (1951). No such showing was made. When Milanowski learned, on April 16, that the barge was at Berth C, he inquired of YPF and was assured first that it would finish discharging that afternoon and later that it had. He was entitled to rely on these assurances and their clear implication that the berth would be available the next day. When, on the 17th, he learned of the Esso Rosario's continued presence, it was too late to head off the Greenpoint. Similarly, although the captain of the Greenpoint knew about the Esso Rosario in the early morning of April 17, he also had a right to rely on the "express assurance" of the Affreightment Contract, Cities Service Transp. Co. v. Gulf Refining Co., 79 F.2d 521 (2 Cir., 1935), particularly in the light of Camerata's advice that the barge was expected to leave the berth designated by YPF before the Greenpoint arrived.[2]
 
 
 14
 YPF claims also that the damage could have been avoided or lessened if no attempts had been made to maneuver the Greenpoint from the place where she grounded until the tide floated her. Cf. The Tynebridge, 6 F.Supp. 941 (E.D. Va.1934). It is true that one liable for violating a safe berth clause "may lessen the amount of damages for which he is responsible by showing negligence, or even lack of diligence, on the part of the person wronged, in failing to take steps to lessen certain or even probable damages," Constantine & Pickering S. S. Co. v. West India S. S. Co., supra, 199 F. at 967-968. However, this is an issue on which the defendant has the burden. McCormick, Damages (1935) § 33, at 130. Here the burden was not sustained. There was no proof how much of the damage to the plating was caused by the initial grounding and how much by the subsequent maneuvering. There was likewise no proof that the Greenpoint would have floated at high tide; she did not at the afternoon high tide of April 17, and it was only after being maneuvered closer to the dock later that night and then lightened that she was refloated. Finally the record is quite inconclusive as to who ordered the maneuvers. YPF's representatives were on the dock; they, the captain of the Greenpoint, the two port pilots, and Milanowski all seem to have been participating in the endeavor.
 
 
 15
 Two other contentions of YPF are readily answered. The first relates to the failure to lighter. Assuming as we do that the advice given Milanowski by YPF to "enter ship without lightering if possible" did not waive the contract provision as to 31' maximum draft, there is no evidence that the Greenpoint failed to meet it. And, whether the decision not to lighter was wise or not, there is nothing to show it would have had any untoward consequences if YPF had provided the safe berth it had warranted; so far as the record shows, the purpose of lighterage at Recalada or Interseccion was to enable the vessel to navigate shallow waters in the Rio de la Plata or in the Buenos Aires channel, not to meet conditions at the dock. The other argument relies on a clause in the fuel oil purchase order, which was incorporated into the Affreightment Contract, that "The Seller shall not be obliged to deliver or Buyer obliged to receive said product when and while and to the extent that Buyer is prevented from receiving or disposing of it or Seller from Manufacturing or making deliveries in its customary manner by acts of God, fire, strikes or other labor disturbances * * *", coupled with the fact that in April, 1957, tug employees in Buenos Aires, in an effort to raise their wages, were working only minimum hours. Whatever effect this might or might not have had on YPF's obligation to receive the cargo, it has none on any issue before us.
 
 
 16
 YPF has devoted a considerable part of its briefs to a contention that Republic acted in "collusion" with Paragon, and has also moved that we vacate the decree below on that ground. The points particularly urged in the briefs are that Republic's proctor was an associate in the firm which represented Paragon, and that Republic failed to make any defense. The motion is supported by verified allegations that the libellant Paragon of New York, Republic, and Greenpoint Tankers, Inc., a Delaware corporation said to be registered owner of the Greenpoint, were all owned by the Schwartz brothers, and that Paragon of Delaware and Circle Shipping Co. were in turn owned by libellant — which facts were not known to YPF until after the trial. YPF says that if it had known or anticipated that Republic, a Panamanian corporation, would not defend against Paragon, it might have pleaded sovereign immunity, since its policy of not making this defense in American courts applied only when the plaintiff was American, as was the case with Paragon's direct claim but not with Republic's third-party claim. The myriad of Schwartz-owned corporations is, indeed, bewildering, and it would have been better if Republic had tendered the defense of Paragon's libel to YPF rather than going through what was only a form. As against this, the Court was not deceived as to the course Republic was taking, Republic's abstentionist position having been plain from the beginning, and it is hard to see that YPF suffered any prejudice thereby. YPF knew about the nature of the representation of Republic from the outset of the litigation — indeed, one must have some credulity to believe that YPF had not realized long before that Paragon Oil Co. of New York and Paragon Oil Co. of Delaware might be affiliated, or had not suspected a link between Paragon of Delaware and Republic when it negotiated complementary purchase orders with them, addressing both "% Sieling & Jarvis Corp." in the same building. Even if YPF is entitled to have the separate entities of the congeries of Schwartz-owned corporations disregarded, it would be liable none the less, since the ultimate responsibility to provide a safe berth rested on it; and the true party in interest would still be American. Indeed, we see no reason why libellant's direct claim against YPF should not have been sustained, on a theory akin to the liability to the shipowner of a stevedoring company that contracts with a charterer, Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 428, 79 S.Ct. 45, 3 L.Ed.2d 413 (1959), or even with a consignee, Waterman S. S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 423-425, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960). Neither are we told of any substantial defenses that an independent proctor could have interposed for Republic with any hope of success. The main suggestion is that something could have been made of the fact that Milanowski worked also for Circle Shipping, another Schwartz-owned corporation which was agent for libellant as well as for Republic, so that any fault on his part would defeat the recovery by the former against the latter. A sufficient answer is that we discern no fault to impute.
 
 
 17
 Finally, YPF claims that Paragon did not prove the allegation in the libel that it owned the Greenpoint. We need not debate whether YPF's denial of knowledge or information sufficient to form a belief as to this allegation was enough, without more, to require Paragon to submit proof of title. See Boston Insurance Co. v. City of New York, 130 F. 2d 156 (2 Cir., 1942). Paragon introduced the Voyage Charter with Republic in which Paragon was characterized as "Chartered Owner." This sufficed to bring into play the "almost universal rule that for a conversion of, or damage to, bailed goods by a third person, the bailee is entitled to recover the full value of the goods or the full extent of the damage inflicted." Brown, Personal Property (2d ed. 1955), 390; The Winkfield, L. R. [1902] page 42. Cf. Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). If, as YPF now alleges in its motion, Greenpoint Tankers, Inc., also owned by the Schwartz brothers, was the "registered owner" of the Greenpoint, the district court has sufficient resources to protect YPF against any attempt at double recovery — an attempt we are confident will not be made.
 
 
 18
 The judgment is affirmed and the motion to vacate dismissed.
 
 
 
 Notes:
 
 
 [1]
 Recalada is located in the Rio de la Plata almost due south of Montevideo and about 137 miles southeast of Buenos Aires. Interseccion is about 100 miles northwest of Recalada, at the entrance of the channel to Buenos Aires harbor
 
 
 [2]
 This would be so even though, as YPF contends. Camerata may have been acting on the basis of advice from Milanowski, since this advice was a reasonable interpretation of information Milanowski had received from YPF