**VENORE TRANSPORTATION COMPANY, Plaintiff,**

v.

**OSWEGO SHIPPING CORPORATION, Defendant and Third-Party Plaintiff,**

v.

**BANCO do BRASIL, Third-Party Defendant.**

**No. 69 Civ. 1099.**

United States District Court, S. D. New York.

Aug. 29, 1973.

Mendes & Mount, New York City, for plaintiff; Daniel Huttenbrauck, Howard M. McCormack, New York City, of counsel.

Symmers, Fish & Warner, New York City, for defendant and third-party plaintiff; William Warner, New York City, of counsel.

Newman & Schlau, New York City, for third-party defendant; Richard L. Newman, Frank E. Nattier, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Venore Transportation Company, owner *pro hac vice* of the S.S. Santore seeks recovery of damages sustained by her while under time charter to the defendant, Oswego Shipping Corporation, during the discharge of a cargo of grain at Bahia, Salvador, Brazil. The claim is based upon Oswego's alleged breach of the safe berth clause contained in the charter party.[1] At the time of the occurrence the vessel was

1. The time charter originally was between Marven Steamship Corporation, disponent owner, and Oswego Shipping Corporation; Venore was later substituted for Marven.

under a voyage charter from Oswego to Banco do Brasil. In turn, Oswego, as third-party plaintiff, asserts a claim against Banco do Brasil, as voyage charterer, alleging a breach of the safe berth clause in their charter which provided for a voyage from a United States port, with a full cargo of wheat in bulk to Salvador, Recife and Fortaleza in Brazil, with a safe berth at each port. The bill of lading covering the cargo of wheat was endorsed to Moinha da Bahia, S.A. and Bahia Industrial S.A. (hereinafter referred to as "Receivers").

Pursuant to the aforesaid time and voyage charters the Santore sailed from Galveston, Texas, on or about April 24, 1964 with a cargo of wheat bound for Salvador, Brazil, the first discharging port, there to be delivered to the Receivers. The vessel arrived at the port of Salvador in the early evening of May 8, 1964. She was to dock at a pier known as the "Coal Wharf" where the Receivers maintained equipment for the discharge of grain by pneumatic means, but the Santore was directed to an anchorage outside the breakwater because another vessel then at the Coal Wharf had not completed discharging operations. The Santore remained at the anchorage from May 8th until May 10th waiting for the prior vessel to leave the Coal Wharf.

Captain Long, Oswego's port captain, had arrived in Salvadore two or three days before the Santore to expedite her discharge and he discussed the docking arrangements with Cory Brothers, Oswego's agents there. Long also discussed with the Receivers the Coal Wharf designated for Santore's discharge. He was particularly concerned with the functioning of the Receivers' pneumatic discharging equipment and arranged for a special reducing fitting for the discharging system to assure the expeditious discharge of Santore's cargo. He also examined the Coal Wharf, a long concrete pier, and found it satisfactory in all respects. While there he had observed that two pontoons were in use by the discharging vessel and was told that this was to keep the ship about twenty feet off in sufficient depth of water. The depth at the quay at the Coal Wharf was twenty-six feet and vessels of deeper draft could be berthed by being breasted out by pontoons. A pontoon consisted of two steel cylindrical tanks or caissons covered by a wooden housing forming a somewhat square platform about twenty-four feet on a side and four and one-half feet to five feet high. The pontoon, in effect, acted as a buffer between the quay and the vessels.[2] While the Santore was at the anchorage from May 8th to May 10th, Captain Long came aboard and conferred with Captain Edelheit, the Santore's Master, concerning the discharging berth. He advised the Master that two pontoons would be used in the berth to keep the vessel off the quay and in sufficiently deep water. Neither Captain Long nor Captain Edelheit had ever been in Salvador before.

On May 10th, Captain Long boarded the vessel and informed Captain Edelheit that the designated berth would be free and at about 1:00 p. m. the Santore proceeded to the Coal Wharf. As the vessel approached the vacated berth, it was noticed that only one pontoon was in place instead of two. After talking by megaphone with the shore, the pilot reported that one pontoon had been damaged by the vessel previously in the berth and that it had been towed away for repair. The Master was given to understand by Long and the pilot that the repaired pontoon would be returned in a matter of hours; additionally, the pilot assured the Master it would be "all right" to moor with one pontoon.

The Master, who had no prior experience with pontoons, decided to dock using the one pontoon, and with the assistance of the pilot and two tugs the ship was safely docked by 3:25 p. m. with the pontoon placed amidship about twenty feet away from the dock. The weather

---

2. Pontoons were required for the Santore since her arrival draft was 29.8 feet.

then was clear and mild; however, the log entry at 4:00 p. m. reads: "[M]ooring lines have to be continuously tended trying to keep the bow and the stern at an even distance from the dock. One pontoon fender acts as a pivot which is aggravated by the heavy swell and surging of the vessel."

Captain Long, after observing that the discharge equipment was working well, went ashore inviting the Master to join him at his hotel that evening. Shortly after 6:00 p. m., Captain Edelheit went ashore and visited with Long. When the Master left the vessel, things were proceeding smoothly; there were on duty a mate and a quartermaster on deck; and an engineer, fireman and an oiler in the engine room. The remainder of the crew and officers had permission to go ashore and most of them did so. While Captain Edelheit was ashore the weather changed; he returned to the Santore about 10:30 p. m. There was some wind in brief squalls and intermittent rain; thereafter there was torrential rain, thunderstorms and squalls, the force of which was not recorded except by log entry. The mate reported that they had a hard time with the pontoon; the ship was "working" and the pontoon was acting as a pivot. The Master directed that in the event anything went wrong he be notified immediately and then went to his cabin where he lay down in his shore clothes. After midnight, the ship was rolling and commenced surging more than usual. At 12:20 a. m., the chief engineer made an entry in the engine log: "At Grain Dock—Ship Slamming Dock, Steam on Engines at 12:20, Ready to Maneuver." At about 1:20 a. m., while the Master was in his cabin, the ship took a sharp roll of about twenty to twenty-five degrees. The mate then reported that the wooden housing of the pontoon had been smashed and shortly thereafter that the two metal caissons had been crushed together and the entire pontoon completely destroyed. At or about this time the discharging of cargo was halted. The Master determined an emergency exist-

ed, that there was risk of the vessel being smashed and ordered the engines ready for departure. He went ashore to get a pilot and tug boats to take the vessel out of the harbor. He encountered considerable difficulty in his mission because he could not speak Portuguese and could not find anyone on the dock who spoke English. The Master, after some telephonic difficulty, finally reached the duty officer of Cory Brothers who stated that he would attempt to get a pilot and tugs. He was advised that no tug would be available before 6:00 a. m. but an effort would be made to get a pilot. A pilot boarded the Santore at 3:10 a. m. At 3:45 a. m. the ship commenced heaving the port anchor and at 3:52 a. m. all lines were aboard and the ship was clear of the dock. By this time, the ship had been damaged by two incidents due to the absence of a pontoon and heavy ground swells: (1) the bow was sharply dented when the ship forcefully struck the concrete quay, and (2) several of the hull plates were pushed in when the ship pounded against the pontoon before its complete destruction. When the vessel cleared the dock the wind was from the south east, coming over the sheds and blowing her off the dock.

The ship had no difficulty in leaving the berth and returned to her former anchorage where she remained until May 13th. While at anchorage during this period, the Master refused to go back to another pier without assurance of proper protection. He finally agreed only after representatives of Oswego, the time charterer, Banco do Brasil, the voyage charterer and the Receivers of the cargo, assured him that two or three pontoons and other safeguards would be provided. He then docked at a different pier where three pontoons were supplied, one of which was placed forward, the other amidship and the third aft, and thereupon the discharging of the balance of the wheat cargo was commenced and completed without incident on May 27th.

Against this background of facts, the issue is whether Oswego, the time charterer, breached its warranty to

supply a safe berth and if it did, whether it is liable for the resulting damage. The record compels the conclusion that the Coal Wharf was not a safe berth for the Santore and that the warranty was breached. That the vessel was initially docked with only one pontoon and without immediate mishap does not necessarily mean that the pier was a safe berth—one that fulfilled Oswego's obligation under the safe berth clause of the time charter. Clause No. 6 thereof provided that cargos be "discharged on any dock or at any wharf or place that charterers or their agents may direct, provided the vessel can safely lie always afloat at any time of tide . . ."—a warranty that continued from time of arrival until departure.[3] The wharf with a single pontoon was not a place where the vessel could "safely lie always afloat at any time of tide." The evidence abundantly establishes that one pontoon was insufficient to keep the vessel off the quay under variable conditions reasonably to be anticipated. There was no certainty how long good weather would last.[4] Substantial ground swells of considerable force were a foreseeable occurrence to those familiar with the port. That more than one pontoon was required to make the pier a safe berth also appears from the testimony of da Silva, the port pilot, that all ships with a thirty-foot draft discharging wheat generally used pontoons to keep them from the quay. Since Oswego breached its warranty to provide a safe berth it is accountable to plaintiff for the resulting damages.

Plaintiff's recovery, however, may be lessened if the Master's actions after the Santore was docked were intervening acts of negligence wholly or partially causing the damages sustained by the vessel.[5] The burden on this issue is upon Oswego.[6] It contends that the Master of the Santore was negligent in various respects and that in any event the damages should be divided equally. Banco do Brasil in resisting Oswego's cross claim makes similar charges which in some respects, but not all, parallel those made by Oswego and so these contentions may be considered together. Banco do Brasil relies upon the testimony of an expert witness to support its plea for exoneration from liability. In general, the contentions are that Captain Edelheit did not act as a reasonably prudent master or exercise good seamanship in that (1) he should have recognized the situation as unsafe when on approaching the Coal Wharf he ascertained that one of the two pontoons had been damaged by the prior vessel and taken away for repairs; (2) he should have taken the vessel back to the anchorage until the damaged pontoon had been repaired and replaced or another substituted; (3) he should have issued an ultimatum to the agent and port authorities that if a second pontoon were not supplied within one-half hour to an hour he would leave the berth; (4) he should not have gone ashore prior to the re-

---

3. *Cf.* Paragon Oil Co. v. Republic Tankers, S.A., 310 F.2d 169, 173 (2d Cir. 1962), cert. denied, 372 U.S. 967, 83 S.Ct. 1092, 10 L. Ed.2d 130 (1963); Constantine & Pickering S. S. Co. v. West India S. S. Co., 199 F. 964, 967–968 (S.D.N.Y.1912) (Hough, D.J.).

4. *Cf.* Reardon Smith Line, Ltd. v. Australian Wheat Board, 2 Lloyd's List L.R. 148, 158 (Austl.1954): "The absence of a buoy was temporary . . . but . . . the berth was one which, because of the natural features, its situation and its construction, exposed a ship lying at it to considerable danger from northerly weather, and . . . the buoy was an attempt to remedy this natural defect in the character of the port. There was no certainty when the buoy would be replaced, just as there was no certainty as to how long the good weather would last . . . [W]hile the buoy was absent the berth was definitely unsafe . . . "

5. *See* Ore Carriers of Liberia, Inc. v. Navigen Co., 435 F.2d 549 (2d Cir. 1970); Nassau Sand & Gravel Co. v. Red Star Towing & Transp. Co., 62 F.2d 356 (2d Cir. 1932); American President Lines, Ltd. v. United States, 208 F.Supp. 573 (N.D.Cal.1961).

6. *See* Paragon Oil Co. v. Republic Tankers, S.A., 310 F.2d 169, 174 (2d Cir. 1962), cert. denied, 372 U.S. 967, 83 S.Ct. 1092, 10 L. Ed.2d 130 (1963).

placement of the missing pontoon nor relieved most of his crew; (5) he should have maintained his engines in constant readiness for departure; (6) he should have arranged for prompt availability of pilot and tug service and immediately upon his return to the vessel, in view of the then existing conditions, have contacted them forthwith; (7) he should have, in view of the deteriorating weather conditions taken departure from the Coal Wharf with or without a pilot or tug assistance especially after the ship experienced the roll of twenty to twenty-five degrees; and (8) he should have employed a bilingual gangway watchman who spoke the local language or, if one were not available, have sounded the alarm signal and called for pilot and tug assistance.

■ The cataloging of what the Master "should or should not" have done reflects a prime instance of Monday morning quarterbacking. Banco do Brasil's expert witness had never been in the Salvador port. His judgment in some respects is not only self-contradictory but is challenged by the contrary views of Captain Long and the port pilot who were on the scene, participated in events and were familiar with current local conditions. Thus, both Captain Long and the pilot agreed that under the prevailing conditions it was safe for Captain Edelheit to accept the berth with the one pontoon.[7] In this instance, the expert conceded he, too, would have docked under the existing conditions. Moreover, Captain Edelheit was led to

believe by Captain Long and by the pilot that a second pontoon would be supplied in a matter of hours; additionally, he was assured by the pilot that it would be "all right" to berth the vessel with the one pontoon pending the delivery of the second.[8] Captain Edelheit, unfamiliar with conditions at the port, was entitled to rely on these assurances.[9] He was unaware that variable conditions at the Salvador port could thereafter make the use of one pontoon hazardous and render the wharf unsafe. Moreover, even had no assurances been given, the charter party was itself an express assurance that the berth was safe, upon which the Master had a right to rely.[10] Under all the circumstances, the Santore's Master was justified in docking at the Coal Wharf even though only one pontoon was then supplied.

■ As to the contentions that Captain Edelheit should not have gone ashore or relieved most of his crew and should have maintained his engines in readiness, Captain Long testified that he did not think it unusual that the Master left the vessel to go ashore when he did since everything was then moving along smoothly. Long and the pilot were of the view that, considering the anticipated delivery of the second pontoon, there was no reason for concern about the ship's safety when Captain Edelheit went ashore. The Master testified that he did not consider an emergency existed until the steel caissons of the pontoon had been destroyed, which occurred at approximately 1:20 a. m., a judgment for which under all the circumstances he

---

7. Captain Long in his deposition testified: "I felt at the time that the vessel could safely lie alongside the one pontoon, and certainly, since it was only a matter of hours before the other one was going to become available I felt there was no problem at all." (Long dep. p. 54). The port pilot, da Silva, testified that at the time of docking one pontoon was "sufficient because the sea was very calm, there were no waves, nor ground swells." (da Silva dep. p. 27).

8. The pilot was "performing a service for which the charterer was responsible." Park

S.S. Co. v. Cities Service Oil Co., 188 F.2d 804, 806 (2d Cir. 1951), cert. denied, 342 U.S. 862, 72 S.Ct. 87, 96 L.Ed. 648 (1951).

9. Cities Service Transp. Co. v. Gulf Refining Co., 79 F.2d 521 (2d Cir. 1935).

10. *See* Paragon Oil Co. v. Republic Tankers, S.A., 310 F.2d 169, 173 (2d Cir. 1962), cert. denied, 372 U.S. 967, 83 S.Ct. 1092, 10 L. Ed.2d 130 (1963) ; Park S.S. Co. v. Cities Service Oil Co., 188 F.2d 804 (2d Cir. 1951), cert. denied, 342 U.S. 862, 72 S.Ct. 87, 96 L.Ed. 648 (1951).

cannot be faulted.[11] He was then confronted with an unanticipated situation and acted with due diligence. He was of the view that although Salvador was not a compulsory pilot port, under the worsening weather and sea conditions with a Brazilian naval vessel directly astern of the Santore and his general unfamiliarity with the port, he would risk not only greater damage to the vessel but even the loss of lives were he to take the vessel out without the aid of a pilot.[12] Again, only a wisdom born of hindsight would attribute fault to the Master in waiting for a pilot familiar with the harbor. Here, it is not without interest that da Silva, the experienced port pilot, testified that when conditions are dangerous a captain always calls for a pilot. Taking into account the extreme weather and sea conditions and the Master's lack of familiarity with the port, the prospect was real that had he undertaken to leave the quay without the aid of a port pilot or tugs, if available, it could have presented a risk of even greater damage than that sustained by the vessel. That it now appears alternative procedures (i. e., leaving the berth without a pilot) might have been a safe course does not establish that the Master's actions taken as events unfolded were unreasonable.[13] As to the claim that the Master should have employed a bilingual watchman while at the port, the defendants have failed to establish that such a general practice existed when in foreign ports. To the contrary, the third-party defendants' expert's opinion on this claim is negated by the testimony of Captain Long, the defendants' witness.

As to the Master's failure to blow the whistle signal for a pilot, he testified he never was informed of such a signal and that his practice was to call his agent to secure a pilot. The expert witness testified that the signal can be found in the sailing directions for the particular port; however, the sailing directions received in evidence [14] do not contain such information. Moreover, as already noted, Captain Edelheit, upon deciding an emergency situation existed, immediately contacted Cory Brothers for pilot and tug assistance. A pilot was obtained by Cory Brothers who sent for him by car during a raging storm, and he was brought from his home to the dock where after some delay and difficulty he boarded the vessel. It is questionable that had a signal been sounded for the pilot that he would have arrived and boarded the vessel any earlier than he did.

Under all the circumstances, it has not been established that the Master was negligent or imprudent in his course of action or that his conduct was an intervening cause of the damage. Accordingly, plaintiff is entitled to recover the cost of repairs and losses due to the detention of the vessel during the repair period, which have been stipulated at $225,193.15.

■ There remains Oswego's claim against Banco do Brasil for indemnity and counsel fees based upon the safe berth warranty by Banco, as the voyage charterer. Banco resists Oswego's claim upon several grounds. First, it contends that responsibility for the lack of a second pontoon which resulted in rendering the berth unsafe rests upon Cory Brothers who requisitioned only one pontoon; that since Cory Brothers acted as agents for both Venore, the shipowner plaintiff, and Oswego, the defendant time charterer, the sole responsibility for the unsafe

---

11. "The Court will seldom question the judgment of a ship master in making his decisions as to the proper handling of his vessel." The Maurice R. Shaw, 46 F.Supp. 767, 769 (D.Me.1942). *Cf.* The Smith Terry No. 1, 34 F.2d 570 (S.D.Fla.1923), aff'd sub nom., Hupper v. Hyde, 296 F. 862 (5th Cir. 1924).

12. The deck log entry on May 11th at 1:20 a. m. reads in part: "Harbour congested with navigational hazards and local knowledge and assistance imperative . . .".

13. *Cf.* American President Lines, Ltd. v. United States, 208 F.Supp. 573 (N.D.Cal. 1961).

14. Oswego Exhibit K.

berth is attributable to their intervening negligence, which exonerates Banco do Brasil from liability for any breach of its warranty. Next, it contends that both the shipowner and Oswego knew that Banco do Brasil, as voyage charterer, was a bank arranging for grain to be imported into Brazil to help alleviate hunger there and hence neither one "could be said to have relied upon the nautical knowledge of the bank but obviously chose to rely and did rely on the Master, expeditor [Captain Long] and the ship's agent, Cory Brothers." The latter contention is not only irrelevant but without substance. Banco's express warranty of a safe berth is not nullified because it is a bank or allegedly was engaged in a non-commercial transaction. The warranty means what it says, and if Banco committed a breach, it is cast in liability just as any other warrantor who fails to live up to its contractual undertakings.

As to the claim of exoneration from liability, Banco's position, however it phrases its various contentions, is that it had nothing to do with the berthing of the vessel; that all negligent acts and conduct with respect thereto, if any, were those of Cory Brothers, acting for both the owner and Oswego; in sum, that it had no agent in Salvador whose conduct can be charged to it. Under the voyage charter, the vessel was consigned to "charterers agents" at port of discharge. Banco in answer to an interrogatory as to the name of its agent at Salvador, stated "Banco do Brasil had no agent other than the one indicated in the Charter Party" and then added "[No agent was listed in the Charter Party in the Port of Salvador . . .]." Banco denies that Cory Brothers was its agent there.

But assuming, as Banco contends, that Cory Brothers was not its agent for any purpose, who was? Banco, the voyage charterer, was required to designate the berths of discharge. As already noted, the bill of lading covering the cargo of wheat was endorsed to Moinha da Bahia, S.A. and Bahia Industrial, S.A.; they were designated by Banco do Brasil as Receivers of the cargo at Salvador. The Receivers nominated the Coal Wharf as the discharging pier. It cannot be gainsaid that in performing that function they were acting for Banco. Captain Long had been in close consultation with the Receivers during the two days before the arrival of the shipment and had worked out with them an addition to their pneumatic discharging equipment to expedite the cargo delivery to them. The Receivers' relation to Banco was such that in its post-trial brief Banco perforce acknowledged ". . . Banco do Brasil does not suggest that because it had no agent in Brazil that it was less responsible for the nomination of a safe berth than it would be if it had an agent. Banco do Brasil freely and willingly accepts the responsibility it contracted to, i. e., the furnishing of a safe berth. The berth was nominated by the Receiver and if the berth was not safe the responsibility is Banco do Brasil's." Having thus acknowledged its obligation under the warranty, Banco seeks exoneration by adding: "However, if a berth which is safe requires some additional equipment because of the nature or characteristics of the vessel, the need for which is open and obvious to those controlling the destiny of the vessel, then the failure to secure such equipment or even request the same is upon those who accept the onus to do so and if it is done improperly the responsibility is attributable to that agent or its principal." This attribution of fault to the shipowner or Oswego, or both, a reiteration of Banco's main contention, does not however relieve it of its express obligation under the warranty of a safe berth—a non-delegable obligation.[15] The Coal Wharf designated by the Receivers proved to be unsafe.

15. In Park S.S. Co. v. Cities Service Oil Co., 188 F.2d 804 (2d Cir. 1951), cert. denied, 342 U.S. 862, 72 S.Ct. 87, 96 L.Ed. 648 (1951), the owner of a vessel hired a pilot who negligently designated an unsafe anchorage. The charterer was held liable since the pilot was performing a service for which the charterer was responsible.

The Receivers, whose equipment was immediately adjacent to the quay, were particularly knowledgeable of conditions at the harbor and the Coal Wharf and knew that without at least two pontoons it was not a safe berth for the Santore. Moreover, during the two days prior to the vessel's arrival and during Captain Long's consultation with the Receivers on expediting the cargo delivery, they knew that the two pontoons were used by the prior vessel. The Receivers and Captain Long had anticipated that two would be available to the Santore when she berthed. Two pontoons were in position when Captain Long went aboard the Santore on May 10th to advise that the berth would be vacated and was available for the discharge of the Santore's cargo. When the Santore was berthed, the pneumatic system was attached to the vessel to unload the cargo; the Receivers then knew there was only one pontoon, thereby rendering the wharf unsafe during the entire period required for unloading the wheat cargo. Thus, even if Cory Brothers was not Banco's agent, or if Banco had no agent in Salvador, the Receivers designated a berth for the discharge of cargo, which it knew was unsafe with but one pontoon. It was performing a service for which Banco is responsible.[16] That Oswego also failed in its duty to the shipowner does not relieve Banco of its breach in the designation of an unsafe berth. Banco, as the voyage charterer, breached its warranty to Oswego, just as Oswego, the time charterer, breached its warranty to the shipowner. The acts and conduct of each contributed toward the occurrence and resulting damage sustained by plaintiff for which Oswego has been held liable to the plaintiff shipowner. Under the circumstances, there should be a division of damages and Oswego is entitled to recover from Banco one-half of the judgment awarded in favor of the plaintiff.

Both the defendant and third-party defendant urge that this Court, in the exercise of its power as an admiralty Court,[17] disallow prepayment interest on the ground of inexcusable delay by plaintiff in bringing this suit and its dilatory conduct in completion of the Master's deposition, which further delayed the trial. The damage sustained by the Santore occurred on May 10, 1964, almost ten years ago. Plaintiff did not commence this action until March, 1969, and no explanation has been offered for this inordinate delay. The taking of the Master's deposition dragged on and was not completed until September, 1970. To allow interest from the date of the casualty would amount to more than sixty (60%) percent of the judgment, which in view of plaintiff's inexcusable delay in commencing suit would result in rewarding dilatory conduct. Had plaintiff acted with diligence the case could readily have been prepared and tried within three years after the casualty.[18] Under the circumstances, interest will be allowed for a period commencing three years prior to the entry of judgment herein.

The foregoing, together with the findings stipulated by the parties, shall constitute the Court's findings of fact and conclusions of law.

Judgment may be entered accordingly.

16. *Cf.* Park S.S. Co. v. Cities Service Oil Co., 188 F.2d 804, 806 (2d Cir. 1951), cert. denied, 342 U.S. 862, 72 S.Ct. 87, 96 L.Ed. 648 (1951); *see also* Seaboard Sand & Gravel Corp. v. Moran Towing Corp., 154 F.2d 399 (2d Cir. 1946); O'Donnell Transp. Co. v. M. & J. Tracy, Inc., 150 F.2d 735 (2d Cir. 1945).

17. O'Donnell Transp. Co. v. City of New York, 215 F.2d 92, 95 (2d Cir. 1954); The Scotland, 118 U.S. 507, 518–519, 6 S.Ct. 1174, 30 L.Ed. 153 (1886); *see also* Ore Carriers of Liberia, Inc. v. Navigen Co., 435 F.2d 549 (2d Cir. 1970).

18. *See* 1967 Dir.Admin.Off.U.S.Cts., Ann.Rep. 128–29.