VENORE TRANSPORTATION COMPA-
NY, Plaintiff-Appellee,

v.

OSWEGO SHIPPING CORPORATION,
Defendant, Third-Party Plaintiff-
Appellant-Appellee,

v.

BANCO do BRASIL, Third-Party De-
fendant-Appellant-Appellee.

Nos. 871–894, Dockets 74–1007, 73–2759.

United States Court of Appeals,
Second Circuit.

Argued April 23, 1974.

Decided June 13, 1974.

Daniel Huttenbrauck, New York City (Mendes & Mount, New York City, on the brief), for plaintiff-appellee.

William Warner, New York City (Symmers, Fish & Warner, New York City, on the brief), for defendant, third-party plaintiff, appellant appellee.

Richard L. Newman, New York City (Newman & Schlau and Frank E. Nattier, New York City, on the brief), for third-party defendant-appellant-appellee.

Before LUMBARD and HAYS, Circuit Judges, and JAMESON, District Judge.*

LUMBARD, Circuit Judge:

Defendant and third party plaintiff, Oswego Shipping Corporation, a time charterer, and third party defendant, Banco do Brasil, a voyage charterer, appeal from a judgment in the Southern District which awarded $265,727.29 to plaintiff, Venore Transportation Company for breach of warranty of safe berth by both Oswego and Banco do Brasil resulting in damage to the SS Santore, of which Venore was owner *pro hac vice*.[1] Concluding that the acts and conduct of Oswego and Banco do Brasil were responsible for the damage to the Santore, 363 F.Supp. 1366, 1374 (S.D.N.Y.1973), Judge Weinfeld held that "there should be a division of damages" with Oswego, the time charterer, directly liable to Venore for the full extent of loss, and Banco do Brasil required to indemnify Oswego for one half of the judgment recovered by Venore.

On appeal, Oswego argues that it is entitled to full indemnification from Banco do Brasil. Banco do Brasil also appeals and seeks to avoid any liability by maintaining that a safe berth was, in fact, provided the Santore; that even assuming the berth was not safe, the intervening negligence of the vessel re-

lieved the charterers from liability; and that, in any event, the intervening negligence of the time charterer, Oswego, relieved it, the voyage charterer, from any obligation to indemnify. The judgment of the district court is modified with regard to the division of damages to the extent that we hold that Banco do Brasil must indemnify Oswego in full. As so modified, the judgment is affirmed.

On April 24, 1964, the SS Santore, a 14,095 gross-ton ship, owned *pro hac vice* by Venore Transportation Company, sailed from Galveston, Texas, loaded with a full cargo of wheat destined for hunger-stricken northeastern Brazil. The ship was under a standard New York Produce Exchange form of time charter, clause 6 of which provided that "the cargo or cargoes be ladened and/or discharged in any dock or at any wharf or place that charterers or their agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such place where it is customary for similar size vessels to safely lie aground."

Oswego, in turn, had entered into a voyage charter with Banco do Brasil which provided in part that Banco do Brasil would assure safe berths in Salvador, Recife, and Fortaleza, the Brasilian ports at which the SS Santore was to discharge its cargo.

On the evening of May 8, 1964, the SS Santore arrived in Salvador. She was to dock at a pier known as the "Coal Wharf" where two receivers designated by Banco do Brasil maintained equipment for the discharge of grain. At the time of the Santore's arrival, however, another ship was occupying the berth, so that the Santore remained at an anchorage outside the breakwater awaiting the departure of this other vessel.

Two days prior to the Santore's arrival, Captain Edward Long, Oswego's port

---

* Senior District Judge of the District of Montana, sitting by designation.

1. An owner *pro hac vice* is not the true owner of a vessel, but rather one who has entered into a demise charter under which the true

owner surrenders full control of the ship. The owner *pro hac vice* may then enter into time or voyage charters with other parties and in relation to these parties it stands in the position of the owner. Gilmore & Black, The Law of Admiralty § 4–23 (1957).

captain, had arrived in Salvador to arrange for the ship's docking and the expeditious discharge of cargo. Captain Long, who had never before been in Salvador, discussed docking arrangements with Cory Brothers, Oswego's agents in Salvador, and spoke with the receivers designated by Banco do Brasil, Moinha da Bahia, S.A. and Bahia Industrial S. A., about the installation of special equipment to facilitate the unloading process. He also inspected the wharf and concluded that it was satisfactory in all respects. While there, he noticed that two pontoons were placed between the pier and the discharging vessel then lodged there, the purpose being to prevent the ship from striking against the concrete pier and to enable the vessel to float in water deeper than its draft while docked.

After the SS Santore's arrival, Captain Long went on board and discussed with Captain Edelheit, the ship's master, plans for discharging the cargo. At this time, Captain Long informed him about the use of the pontoons at the berth.

On May 10 at about 1:00 p. m. the Santore proceeded to the Coal Wharf for docking. As the ship neared the dock, it was noticed that one of the pontoons was missing. After inquiries were made by the harbor pilot, he and Captain Long reported back to Captain Edelheit that the pontoon had been damaged, that it would be returned within a few hours, and in the meantime it would be "all right" for the Santore to moor with one pontoon.

Relying on these assurances, Captain Edelheit, who had no familiarity with the port at Salvador and had had no prior experience with pontoons, proceeded to dock the ship. After he and Captain Long were convinced that the unloading equipment was functioning properly, Captain Long went ashore, followed shortly thereafter by Captain Edelheit at about 6 p. m. While the captains were ashore, the weather changed. First there were brief squalls and intermittent rain; thereafter there was torrential rain, thunderstorms, and squalls.

When Captain Edelheit returned to the ship at 10:30 p. m., the SS Santore was rolling and slamming into the pier with the single pontoon acting as a pivot.

At 1:20 a. m., the ship took a sharp roll and crushed the pontoon. Fearful that the vessel would be seriously damaged, Captain Edelheit went ashore to get a pilot and a tug to assist in moving the ship to open water. Because he could not speak Portuguese, he encountered some initial difficulty in obtaining assistance, but eventually contacted Cory Brothers, Oswego's agents in Salvador. A pilot was found and the SS Santore was moved from its berth. Subsequent investigation revealed that the bow of the ship had been sharply dented and that several of its hull plates had been pushed in as a result of the ship's smashing against the dock and the pontoon.

After leaving its berth, the ship remained at its earlier anchorage beyond the breakwater until May 13. During this period Captain Edelheit refused to return to the pier without an assurance that at least two, and preferably three pontoons would be provided. On May 13, the Santore finally docked at a different berth which had three intact pontoons.

I.

■■ The first question which we address is whether there was intervening negligence on the part of the ship's master, Captain Edelheit, relieving the charterers of liability. See, e. g., Ore Carriers of Liberia, Inc. v. Navigen Co., 435 F.2d 549 (2d Cir. 1970); Nassau Sand & Gravel Co. v. Red Star Towing and Transportation Co., 62 F.2d 356 (2d Cir. 1932). We agree with Judge Weinfeld's conclusion that there was no such negligence. Prior to docking the SS Santore, Captain Edelheit relied on the assurance of Captain Long and the harbor pilot that a second pontoon would be supplied shortly and that in the interim it would be "all right" to berth the vessel with only one pontoon. Being unfamiliar with conditions in the harbor, the

master was entitled to rely on these assurances. Moreover, as Judge Weinfeld emphasized, "even had no assurances been given, the charter party was itself an express assurance that the berth was safe, upon which the Master had a right to rely." 363 F.Supp. at 1371. Cities Service Transportation Co. v. Gulf Refining Co., 79 F.2d 521, 524 (2d Cir. 1935).

Nor was Captain Edelheit negligent in going ashore the evening of May 10 or in the actions he took upon returning to the ship. There was no reason for the Master to fear for the ship's safety when he went ashore. The Santore had been properly docked and the equipment for discharging the cargo was functioning properly. When he returned and discovered that the vessel was slamming against the pontoon, he took appropriate steps in a timely fashion to remove her from the berth. The master did not err, as charged by Banco do Brasil, in refusing to leave the berth without a pilot. In light of the torrential storm, Captain Edelheit's unfamiliarity with the harbor, and the presence of a Brazilian naval vessel anchored directly astern, his was actually the more prudent course to follow. Appellant's additional claims that the captain should have employed a bilingual watchman who could have aided him in locating a pilot immediately, and that the Master should have blown a whistle signal for a pilot are also without merit. The record reveals that bilingual watchmen are rarely hired in foreign ports. As for the Master's failure to blow the signal, there is no evidence that Salvador provided for such a signal in its sailing directions. In any event, it is far from certain that a pilot would have arrived any more quickly had a signal been blown by the captain.

## II.

The question remains whether Banco do Brasil must indemnify Oswego for the full amount of the judgment recovered by Venore. In this regard, it is important to note that the relationship between Banco do Brasil and Oswego was not unlike that between Oswego and Venore. Banco do Brasil had also warranted that a safe berth would be provided in Salvador. Its receivers, Moinha da Bahia, S.A. and Bahia Industrial, S. A., had specifically chosen the Coal Wharf as the discharging pier. Indeed, Banco acknowledged in its post-trial brief, that "[t]he berth was nominated by the Receiver and if the berth was not safe the responsibility is Banco do Brasil's."

Nevertheless Banco do Brasil contends that a safe berth was provided and that

"if a berth which is safe requires some additional optional equipment [pontoons] because of the nature or characteristics of the vessel, the need for which is open and obvious to those controlling the destiny of the vessel, then the failure to secure such equipment or even request the same is upon those who accept the onus to do so, and, if it is done improperly, the responsibility is attributable either to that agent or its principal."

■■■ Judge Weinfeld correctly rejected this argument. Banco do Brasil had an express obligation to provide a completely safe berth, an obligation which was nondelegable. *See* Park S.S. Co. v. Cities Service Oil Co., 188 F.2d 804 (2d Cir.), cert. denied, 342 U.S. 862, 72 S.Ct. 87, 96 L.Ed. 648 (1951). The receivers, acting on behalf of Banco do Brasil, were fully aware of the conditions at the Coal Wharf and that, without at least two pontoons, it would be unsafe for the SS Santore to dock there. They were aware that the previous vessel had used two pontoons and in their discussion with Captain Long they anticipated that the same would be employed with regard to the Santore. Nevertheless, they permitted the docking of the ship and the unloading of its cargo to proceed although they were fully aware that two pontoons had not, in fact, been provided. In short, they designated a berth for docking and unloading, which they knew to be unsafe. Since they were acting on behalf of Banco do Bra-

sil, the latter must be considered to have breached its safe berth warranty.

■ Banco do Brasil argues that, even assuming the berth was unsafe, the intervening negligence of the time charterer was the cause of the damage and that, therefore, Oswego should be solely liable to Venore, with no claim over against Banco do Brasil for indemnity. This argument is without merit. The burden was on Banco do Brasil to establish Oswego's intervening negligence. Paragon Oil Co. v. Republic Tankers, S. A., 310 F.2d 169, 173–174 (2d Cir. 1962), cert. denied, 372 U.S. 967, 83 S. Ct. 1092, 10 L.Ed.2d 130 (1963). While Judge Weinfeld did not express his views on this point, it does not appear from the record that Oswego was in any way negligent. Captain Long was no more familiar with the port at Salvador or the berth at which the SS Santore was to dock than was Captain Edelheit. Having no specified knowledge of port conditions, Captain Long was entitled to rely on the assurance of the safe berth warranty given by Banco do Brasil just as was Captain Edelheit on Oswego's warranty. Moreover, both captains learned at the same time that two pontoons would not be available. Captain Long made no suggestion that the ship be docked with only one pontoon. Under the circumstances, if Captain Edelheit, who was primarily responsible for the safety of the ship, was not found to be negligent for docking with just one pontoon, then certainly Captain Long was not negligent.

While Judge Weinfeld found that Captain Edelheit "was led to believe by Captain Long and by the pilot that a second pontoon would be supplied in a matter of hours," there is nothing in the record which establishes that Captain Long actually gave a separate assurance. Rather, from the testimony of both captains, it appears that someone on the bridge, probably the pilot, called down to the shore and was informed that a second pontoon would soon be supplied. This information was then relayed to Captain Edelheit, possibly by Captain Long.

Cory Brothers was also agent for Oswego. But to the extent that it assisted in designating a safe berth for the SS Santore, it was acting on behalf of the receivers and Banco do Brasil, the latter of which had the non-delegable duty of supplying a safe berth. Park S.S. Co. v. Cities Service Oil Co., 188 F.2d 804 (2d Cir. 1951). Moreover, while it could be argued that Cory Brothers was negligent in permitting the SS Santore to dock once it became aware that there would be only one pontoon available for several hours, fault for the damage caused can hardly be placed here since the receivers, acting directly on behalf of Banco do Brasil, which had primary responsibility for providing a safe berth, were also aware at the same time as was Cory Brothers of the absence of one pontoon, yet they did not advise the vessel not to dock. As Oswego points out, nothing on the part of Captain Long or Cory Brothers "hindered, hampered, misled or prevented Banco do Brasil in or from the performance of its obligation to furnish a safe berth." Under the circumstances, the safe berth warranty from Banco do Brasil to Oswego should be given the same full effect as was given the warranty from Oswego to Venore.

The judgment is modified accordingly to allow full recovery by Oswego against Banco do Brasil, and as so modified, it is affirmed.