In the Matter of the Complaint of McAL-
LISTER BROS., INC., a Delaware Cor-
poration, and McAllister Bros., Inc., a
New York Corporation, For Exonera-
tion From or Limitation of Liability As
Owners of the Tugs "Teresa McAllis-
ter", "Holland", and "Steven McAllis-
ter".

Civ. A. Nos. 81–0053, 81–0104
and 81–0105.

United States District Court,
E.D. Pennsylvania.

April 25, 1985.

Robert G. Kelly, Jr., Kelly, Harrington, McLaughlin & Foster, Philadelphia, Pa., for plaintiffs.

James F. Young of Krusen, Evans & Byrne, Philadelphia, Pa., Robert B. Pohl of Burlingham, Underwood & Lord, New York City, Alfred J. Kuffler of Palmer Biezup & Henderson, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHAPIRO, District Judge.

This is an admiralty and maritime claim arising out of an incident in which the World Texas, a cargo vessel, sustained extensive damage on leaving the Port of Philadelphia. McAllister Brothers, Inc., a corporation which supplied tugboat services for the World Texas, filed this Limitation of Liability action under 46 U.S.C. § 183 to exonerate itself from liability; there is jurisdiction under 28 U.S.C. § 1333(1).

The M/V World Texas is a diesel-powered tankship operated by Philtankers, Inc., a wholly owned subsidiary of Phillips Petroleum, Inc. In December, 1980 the World Texas was chartered by Swann Chartering, Ltd. to transport refined oil. Under the charter party, the cargo was taken aboard the World Texas in Mexico for discharge in Chesapeake, Virginia. Subsequently, the discharge port was changed by Swann to its Philadelphia terminal. The Swann terminal is located on the west bank of the Schuylkill River, about four miles above the confluence of the Schuylkill and Delaware Rivers. The World Texas arrived at the Marcus Hook Anchorage in the Delaware River on December 22, 1980.

McAllister Brothers, Inc., a corporation owning tug boats, provided tug services for the inbound voyage upon the request of Charles Kurz Company, the local agent for the World Texas. Orders for tug assistance on behalf of Philtankers, Inc. were made under a contract with McAllister. James Gilliland, licensed to pilot vessels in the Schuylkill River, boarded the World Texas as pilot for the inbound voyage and was paid for his services by those responsible for the World Texas. At all times during this inbound voyage, made without incident, the master of the World Texas was also on board. McAllister's dispatchers received further orders from the vessel's local agent to assist the World Texas out of Swann Terminal. On December 24, 1980, the World Texas departed from the Swann Terminal. On this outbound journey the rudder came in contact with an object in the river or with the bank of the channel and the vessel sustained damage.

Following the institution of this litigation, Philtankers, Inc. filed a motion on July 31, 1981 for a stay of proceedings for a limited period to permit expedited arbitration. Philtankers represented that if the outcome of the arbitration of the dispute between Philtankers and Swann exculpated Swann from liability there would be no further proceedings in this court and that the arbitration proceeding would be completed within six months. The court granted this motion on September 28, 1981 but allowed discovery to proceed notwithstanding the stay. The court further ordered that if there were no award of the arbitrators regarding liability for the claims between Philtankers and Swann within six months of the date of the order, any party to the proceedings could move for an order vacating the stay. On February 22, 1983, (following a report on the progress of the arbitration proceedings and with the consent of the parties) the court ordered the case to be placed in the administrative suspense docket. On June 27, 1983, Swann Chartering, Ltd. moved to have the case removed from the suspense docket. The court, dissatisfied with the delays in the arbitration proceeding, granted Swann's motion on September 20, 1983; Swann and Philtankers then settled. Prior to the arbitrator's decision and award, Swann agreed to pay Philtankers 36% of the vessel's provable damages, with a payment ceiling of $1.5 million and received an assignment of the claim of Philtankers against McAllis-

ter.[1] Swann then sought indemnity or contribution from McAllister for all or part of the amount paid to Philtankers, Inc. in its own right and as assignee of Philtankers.

At a pretrial conference on April 9, 1984, the court granted McAllister's "Motion in Limine to Limit Proof and Theories of Liability Against McAllister," and precluded Swann from affirmatively asserting: (1) that the pilot was negligent in handling the World Texas; (2) that the tugs were inadequate; and (3) that the tugs were not properly attached to the ship.

The reason the court granted this motion was that counsel for Swann had asserted at a pretrial conference held on January 3, 1984, that the sole legal theory upon which it would proceed was its claim that McAllister Brothers should have advised Swann that the Schuylkill River was not navigable for a vessel the size of the World Texas. Swann did not then rely on the assigned claim of Philtankers, which Philtankers, in obtaining a stay to permit arbitration, had represented would be fully disposed of by the arbitration. The case, previously tentatively listed for trial on March 19, 1984 was rescheduled and specially listed for April 23, 1984.

McAllister Brothers pursued its discovery in reliance on the representations made by Swann to the court. After the discovery deadline passed, Swann attempted to assert new theories of liability, either on its own behalf or as assignee of Philtankers. McAllister Brothers was unable to take discovery regarding these new theories and would be greatly prejudiced by Swann's attempts to introduce new theories of liability at such a late date; the court was unwilling to delay further this long-pending case. The sole issue upon which the court allowed trial to proceed was whether the Schuylkill River was an inappropriate navigational channel for the World Texas, and if so, whether McAllister owed Swann a duty to warn of this.

Swann claims that McAllister Brothers, employer of the pilot who navigated the World Texas on the Schuylkill River owed Swann a duty to warn of the potential dangers of navigating this ship in this river, and that the breach of this duty caused damage to the vessel. Swann alleges that the World Texas was too large to navigate the Schuylkill safely. It contends that because McAllister had local expertise regarding these hazards, it knew or should have known that the Schuylkill was unsafe for the World Texas and had a duty to warn Swann of this.

In a limitation of liability proceeding under 46 U.S.C. § 183, the party claiming damages, Swann, rather than the party seeking to exonerate itself from liability, McAllister Brothers, has the burden of proving that the Schuylkill was unsafe for the World Texas. See e.g., Northern Fishing & Trading Co., Inc. v. Grabowski, 477 F.2d 1267 (9th Cir.), cert. denied 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973). Swann has not met its burden of proof. The evidence establishes that the ship would have made the passage safely if reasonable care had been exercised during navigation.

The standard the court must use in deciding whether the Schuylkill was a safe navigational channel is whether in the exercise of reasonable care in the circumstances, a competent pilot would have been able to navigate the ship down river without incident. See e.g., Venore Transportation Co. v. Oswego Shipping Corp., 498 F.2d 469, 472 (2d Cir.) cert. denied, 419 U.S. 998, 95 S.Ct. 313, 42 L.Ed.2d 272 (1974). The size of the World Texas does not itself prove that the Schuylkill was an unsafe navigational channel. The World Texas arrived at the Swann Terminal without incident. Although there was testimony by Swann's expert, Arthur Fertig, that stern first navigation required for a vessel this size was dangerous, Gene Neubauer, a tugboat captain who has provided assistance to vessels in the Schuylkill since 1973 testified that many vessels going up the Schuylkill

---

1. Philtankers had represented on numerous occasions that the arbitration proceeding would fully dispose of all claims involving Philtankers as a reason for delaying this trial.

bow first are taken out stern first. If reasonable care had been exercised during the down river passage, the World Texas would have made it safely.

Although the World Texas was very large, none of the pilots expressed concern that it could not safely navigate the Schuylkill. Pilots familiar with the Delaware River were aboard the World Texas for its journey from the Delaware breakwater to the Port of Philadelphia, for its trip from the anchorage in the Port of Philadelphia to the Swann Terminal on the Schuylkill River and from the Swann Terminal to the Delaware River. The evidence does not show that any of these pilots at any time questioned the ability of the vessel to navigate the Schuylkill River. Both Ewan Corlett, Swann's expert at the arbitration proceedings, and James Stillwagon, McAllister's expert, stated that the Schuylkill is not inherently dangerous for a vessel the size of the World Texas. Paul Barton Withstandley, who chartered vessels for Swann, testified that when chartering the World Texas, he was aware of its length, beam and draft, and believed that the Schuylkill channel was appropriate for its transit. Robert Bush, Senior Marine Adviser to Philtankers reviewed the Schuylkill River charts before the World Texas called at the Port of Philadelphia and did not object to the appropriateness of the Schuylkill as a navigational channel. Finally, James Gilliland, the pilot for docking and undocking of the World Texas, did not consider the transit to and from the Swann terminal inappropriate for that vessel.

The only evidence presented that a ship the size of the World Texas could not navigate the Schuylkill safely was that of Captain Arthur Fertig, an expert witness for Swann. However, the court does not credit Captain Fertig's testimony; Captain Fertig was not a member of the Philadelphia maritime community and had piloting experience only on the Panama Canal. There is no persuasive evidence that anyone in the Philadelphia maritime community believed or had reason to believe that a ship the size of the World Texas could not navigate the Schuylkill safely with reasonable skill and care.

Since the Schuylkill was not unsafe for the World Texas, it follows that McAllister's failure to warn of a situation that did not necessarily present a danger does not impose liability. Even if Swann's contention that the Schuylkill was an unsafe navigational channel for the World Texas were correct, Swann has not established that McAllister had a duty to warn Swann about potential dangers involved.

The agreement between Swann and McAllister contained no provision requiring McAllister to warn of navigational dangers and no such duty is imposed by law. The charter party between Swann and Philtankers provided:

> "The vessel shall load and discharge at safe place or wharf, or alongside vessels or lighters reachable on her arrival which shall be designated and procured by the charterer, provided the Vessel can proceed there to lie at and depart therefrom, always safely afloat."

Under this clause, Swann had a non-delegable duty to provide a safe berth to the World Texas. *See Venore Transportation Co. v. Oswego Shipping Corp.*, 498 F.2d 469 (2d Cir.) *cert. denied*, 419 U.S. 998, 95 S.Ct. 313, 42 L.Ed.2d 272 (1974). Swann argues that because a charterer is vicariously liable to the owner of a ship for a towing company's negligence in selecting a safe berth, the towing company is necessarily obligated to indemnify the charterer for such liability. *Park S.S. Co. v. Cities Service Oil Co.*, 188 F.2d 804, 806 (2d Cir.) *cert. denied*, 342 U.S. 862, 72 S.Ct. 87, 96 L.Ed. 648 (1951), for example, held that although a pilot was employed and paid by the vessel owner, the pilot in selecting an anchorage was "performing a service for which the charterer was responsible." The charterer was therefore liable to the vessel owner for the pilot's failure to select a safe berth.

However, this and other cases called to our attention requiring a third party to indemnify a charterer are those where the third party breached a contractual warrant

of the safety of port and berth, or an implied warranty of workmanlike service. *See Fairmont Shipping Corp. v. Chevron International Oil Co., Inc.,* 511 F.2d 1252 (2d Cir.1975); *Bilkay Holding Corp. v. Consolidated Iron & Metal Co.,* 330 F.Supp. 1313 (S.D.N.Y.1971).

Swann contends that McAllister's failure to warn was a breach of the warranty of workmanlike service, but failure to warn of hazardous navigational conditions is not a breach of this warranty. The implied warranty of workmanlike service generally applies to contracts for ship repair; it does not encompass a duty to warn. A contractor's warranty of workmanlike service is an incident of its undertaking with the shipowner and is comparable to a manufacturer's warranty of the soundness of its manufactured product. *See S.S. Amazonia v. New Jersey Export Marine Carpenters,* 564 F.2d 5 (2d Cir.1977).

The safe berth warranty is a separate express warranty, not a warranty implied by law. Here the warranty of safe berth was between Swann and Philtankers. No such warranty existed between Swann and McAllister Brothers. The duty of Swann to provide a safe berth was non-delegable. *See Venore Transportation Co. v. Oswego Shipping Corp.,* 498 F.2d 469, 472 (2d Cir.) *cert. denied,* 419 U.S. 998, 95 S.Ct. 313, 42 L.Ed.2d 272 (1974). Swann could not delegate this duty to provide a safe berth to McAllister Brothers and cannot require McAllister Brothers to indemnify it for its alleged breach.

However, even assuming McAllister had a duty to warn imposed by law, McAllister's breach of that duty would not impose liability. Swann contends that charterers rely heavily on the local expertise of pilots furnished by towing companies to ascertain local conditions and advise whether the vessel can safely make transit. It also contends that because McAllister had the greatest local knowledge concerning conditions in the Schuylkill, it was the party best situated to give the warnings required and that failure to provide such warning was a breach of duty. If there were a duty to warn imposed by law upon McAllister and if that duty were here implicated because the Schuylkill was unsafe for the World Texas, the claimed dangers were so obvious that Swann cannot contend that it reasonably relied on McAllister Brothers' local expertise to its detriment.

Knowledge of the conditions that allegedly made the Schuylkill an unsafe channel did not require any specialized local expertise. The safety hazards alleged by Swann resulted from the World Texas' size in relation to the Schuylkill River and from the fact that the World Texas would proceed out of the Swann terminal, stern first. The size of the World Texas was known to Swann as well as Philtankers. Information concerning the Schuylkill River was available from readily accessible navigational charts. If, as Swann alleges, these factors made the Schuylkill unsafe, then Swann should have known of these dangers also because they were so obvious. McAllister was not obligated to warn Swann about something it should have already known; there was no breach of a duty to warn imposing liability on McAllister.

In order for Swann to recover, it was required to establish not only that the Schuylkill was an unsafe navigational channel for the World Texas, a condition of which McAllister had a duty to warn, but also that it was this condition that caused the accident, that is, that the damage suffered was the direct and proximate result of the dangers posed by the Schuylkill. *See e.g., DiRago v. American Export Lines,* 636 F.2d 860 (3d Cir.1981). Although Swann claims that because of the World Texas' size, it hit the bank of the river, it failed to convince the court that collision with the river bank was the cause of the accident. The vessel's deck log, prepared on December 24, 1980, stated that "the rudder hit some very hard submerged obstruction or the bank." The report of accident prepared by the master the following day made no mention of the bank, but rather stated that "the ship's rudder and propeller hit some hard submerged obstruction." James Gilliland, the pilot aboard the

World Texas during its departure, denied that the vessel's stern ever came within fifty feet of either bank. Gene Neubauer testified that at all times, as far as he could determine, the World Texas was in the center of the channel during its stern first departure from Swann to the Delaware River. The more likely reason for the accident was navigational error or a submerged object. But because Swann has failed to meet its burden of proving that the Schuylkill was unsafe, the court need not decide the actual cause of the accident.

Swann has failed to establish that the Schuylkill River was an unsafe navigational channel for the World Texas or that McAllister had a duty to warn of navigational hazards the breach of which caused damage to Swann. Therefore, the court finds Swann is not entitled to indemnity from McAllister Brothers and judgment will be entered accordingly.